Ernest Metcalf CAVIN *v.* STATE of Arkansas

CR 92-978                                      855 S.W.2d 285

Supreme Court of Arkansas
Opinion delivered May 24, 1993

*Howell, Price, Trice, Basham & Hope, P.A.*, by: *Dale Price* and *Robert J. Price*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. The appellant, Ernest Metcalf Cavin (Cavin), was convicted of the first degree murder of Taylor Timken Todd (Todd) and sentenced to life imprisonment in the Arkansas Department of Correction. As his arguments on appeal are without merit, we affirm.

On May 7, 1991, police were called to Todd's home. Testimony at trial revealed that Pulaski County Sheriff Deputies

Bragg and Scott arrived to find the front door open. They saw Cavin inside the living room going through drawers and also saw a figure lying on the bed in the corner bedroom.

Cavin, who met the two deputies on the porch, appeared to have blood on his face, hands, and clothing. He told Deputy Scott that "he'd had a bad night and thought he'd just killed this man."

Police found Todd lying partially on the bed and bleeding profusely from the head. At that point, Cavin told the deputies, "Well, I gotta go now," and started out the door, but the officers caught him and put him in handcuffs. Local emergency ambulance service staff arrived soon afterwards and began to administer first aid to Todd, but he died at the scene.

The police placed Cavin in their police car and read him his *Miranda* warnings. He told them that he had to kill Todd and he did not understand why they were arresting him. Cavin had on his person a roll of money surrounding the victim's driver's license.

At the trial, the State introduced the testimony of Deputy Scott as well as that of Ms. Claudette Lamar, a licensed psychiatric technician nurse with Central Arkansas Screening and Assessment Center (a division of Professional Counseling Associates), and Ms. Karen Carlton, a registered nurse with St. Vincent Infirmary Medical Center.

Ms. Lamar testified that she received a phone call from Cavin at about 1:30 to 2:00 a.m. during the course of her work as an emergency telephone operator. According to her testimony, Cavin identified himself and asked to speak to his doctor. When Ms. Lamar told him that his doctor was not available, Cavin told her that he had killed somebody; specifically, he said that he had stabbed a man ten times with an ice pick.

Ms. Carlton's testimony was similar to Ms. Lamar's. She was working in the Psychiatric Ward at St. Vincent Infirmary Medical Center on May 7, 1991, when she received a call from Cavin. The hospital operator had transferred the call to her. During Cavin's conversation with Ms. Carlton, he told her that he thought that he had killed someone and that there was blood all over. Although he refused to provide his victim's name, he told her that he had "beat and beat" his victim over the head. When Ms. Carlton asked him why he had beaten the man, he said that

the person would not shut up.

Ms. Carlton said that Cavin was hysterical and distraught through most of the conversation. When she asked him his name, he said that he was Ernest Cavin; he even spelled his last name.

The State also presented the testimony of Dr. Violette Hnilica, a forensic pathologist at the Arkansas State Crime Lab, who performed the autopsy on Todd the day after his death. According to her report, Todd was a seventy-five year old man suffering from both lung cancer and coronary disease. It was her determination that he suffered five to ten head injuries in the form of blunt trauma and that these injuries were serious enough to cause death. She also found at least five marks on the neck indicting strangulation. Her opinion was that Todd had died due to both the blunt trauma and the strangulation.

Detective Ron Tucker with the Pulaski County Sheriff's office also testified. Tucker was aware that Cavin's rights had been read to him previously and advised him of his rights again. He asked Cavin if he was sober, and he said yes. Tucker recorded Cavin's statement but claimed that during the unrecorded part of the interview, Cavin had stated that Todd had injected him with some unknown drug, and Cavin had fallen asleep. He was awakened by Todd fondling his genitals, but Cavin claimed he merely told him to go away. Further, Cavin stated that he did not remember much of the night of the murder.

During the recorded portion of his statement, Cavin asked the police if they thought he needed a lawyer, but they never gave him a direct answer explaining that they could not make that decision for him.

After hearing all of the evidence, the jury returned a verdict of guilty to the charge of first degree murder and sentenced Cavin to life imprisonment in the Arkansas Department of Correction. It is from that sentence that he appeals.

## PRIVILEGED COMMUNICATIONS

Cavin clams that the trial court erred in denying his motion to suppress the testimony of medical personnel, Claudette Lamar and Karen Carlton.

■ In reviewing a trial court's ruling on a motion to suppress, we make an independent determination based on the totality of the circumstances and reverse only if the trial court's ruling was clearly against the preponderance of the evidence. *Cook* v. *State*, 293 Ark. 103, 732 S.W.2d 462 (1987).

Cavin complained to the trial court that the testimony of these two women should be suppressed because revealing his conversations to either of them violated A.R.E. Rule 503 in that the statements were made as part of a privileged psychotherapist/patient relationship. The trial judge disagreed, explaining that no privilege existed because the relationship required by Rule 503 had not been established at the time the statements were made.

A.R.E. Rule 503 provides in pertinent part:

(a)(1) A "patient" is a person who consults or is examined or interviewed by a physician or psychotherapist.

(2) A "physician' is a person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be.

(3) A "psychotherapist" is (i) a person authorized to practice medicine in any state or nation, or reasonably believed by the patient so to be, while engaged in the diagnosis or treatment of a mental or emotional condition, including alcohol or drug addiction, or, (ii) a person licensed or certified as a psychologist under the laws of any state or nation, while similarly engaged.

(4) A communication is "confidential" if not intended to be disclosed to third persons, except persons present to further the interest of the patient in the consultation, examination, or interview, persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician or psychotherapist, including members of the patient's family.

(b) General Rule of Privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing his medical records or confidential communica-

tions made for the purpose of diagnosis or treatment of his physical, mental, or emotional condition, including alcohol or drug addiction, among himself, physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

(c) Who May Claim the Privilege. The privilege may be claimed by the patient, his guardian or conservator, or the personal representative of the deceased patient. The person who was the physician or psychotherapist at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the patient.

A.R.E. 503 (d)(3) contains an exception to this privilege:

Condition as an element of claim or defense. There is no privilege under this rule as to medical records or communications relevant to an issue of the physical, mental, or emotional condition as an element of his claim or defense, or after the patient's death, in any proceeding in which any party relies upon the condition as an element of his claim or defense; provided, however, a patient shall not be required by order of court or otherwise, to authorize any communication with any physician or psychotherapist other than (A) the furnishing of medical records, and (B) communications in the context of formal discovery procedures.

In arguing that the trial court erred in admitting the statements made to nurses Lamar and Carlton, Cavin claims that because he was seeking professional help when making the calls, the calls should fall within the privilege of A.R.E. Rule 503.

■■ It is true that a confidential communication with a nurse can fall within this privilege. *Baker* v. *State*, 276 Ark. 193, 637 S.W.2d 522 (1982). However, Rule 503(b) does not grant a privilege to all information or communication between the patient and the health provider. *Baker, supra.* There is no privilege with regard to the fact that treatment was sought and received. *State* v. *Sypult*, 304 Ark. 5, 800 S.W.2d 402 (1990). In order to be privileged, the communication must be made for the purpose of diagnosis or treatment of a physical, mental or

emotional condition. *Bussard* v. *State*, 295 Ark. 72, 747 S.W.2d 71 (1988).

■ Since there is no proof that these statements were made while Cavin was seeking treatment, they do not fall within the Rule 503 privilege. Admittedly, Cavin had previously been a psychiatric patient at both St. Vincent and Professional Counseling Associates Emergency Health Service. However, when he made these phone calls, no confidential relationship had been established. Although Cavin was ostensibly calling Professional Counseling Associates to find a doctor, he freely told Ms. Lamar that he had killed someone. He did not ask her for help. When Cavin called St. Vincent and talked to Ms. Carlton, he did not even ask for a doctor. Once the operator transferred the call from Cavin to her, Cavin immediately began telling her about his participation in a killing.

Cavin's statements were not made to the nurses in their professional capacity; nor were the statements made for the purpose of treatment. *See Bonds* v. *State*, 310 Ark. 541, 837 S.W.2d 881 (1992); *Magar* v. *State*, 308 Ark. 380, 826 S.W.2d 221 (1992). As such, these were not confidential communications.

■ Even if the communications were privileged, which they are not, they would nevertheless be admissible under the A.R.E. Rule 503(d) exception because Cavin asserted the defense of involuntary intoxication. In doing so, he placed his mental condition in issue and thereby waived the privilege. *See McVay* v. *State*, 312 Ark. 73, 847 S.W.2d 28 (1993); *Davasher* v. *State*, 308 Ark. 154, 823 S.W.2d 863 (1992).

## AUTHORITY TO ORDER AUTOPSY

Cavin contends that the trial court erred in denying his motion to suppress evidence of an autopsy performed by the State Medical Examiner's Office because the coroner allegedly violated Ark. Code Ann. § 12-12-318 (1987) by delegating his duty to request an autopsy to his deputy, a person not authorized to do so.

At the omnibus hearing on the motion to suppress, the court heard the testimony of Gerald Curtis, deputy Pulaski County Coroner. Mr. Curtis testified that when he arrived at the residence, he found the deceased, Todd, and notified the State

Crime Lab of the incident and took the body to the crime lab in a coroner's van.

The statute in question, Ark. Code Ann. § 12-12-318 (1987), provides in pertinent part:

> When death occurs in such a manner or under such circumstances as described in 12-12-315, the State Crime Laboratory shall have the power and authority to perform such functions and duties as may be provided by this subchapter. *The State Crime Laboratory shall make such examinations or investigations or perform such autopsies to determine the cause of death as the Executive Director of the State Crime Laboratory or his staff deems necessary or as may be requested by the coroner of the county in which death occurs or is discovered*, by the prosecuting attorney of the jurisdiction in which death occurs or is discovered, by the sheriff of the county in which death occurs or is discovered by the chief of police of the city in which death occurs or is discovered, by the Board of Correction or its designee, or the Director of the Department of Correction or its designee, or the Director of the Department of Correction or his designee if the person was in the care, custody or control of the Department of Correction at the time of death. *Deputies of elected officers enumerated above shall have no authority to request an autopsy by the State Crime Laboratory.*
>
> (c) Autopsies or investigations authorized in this section may be conducted without the consent of any person.
>
> (d) *The Executive Director of the State Crime Laboratory and his staff shall not, as part of their official duties, perform any autopsy at the request of any private citizen or any public official other than those enumerated in this section.*

(Emphasis added.)

■ Cavin argues that this statute was violated because Gerald Curtis, a deputy coroner, requested the autopsy, and the statute states specifically that "deputies of elected officials enumerated above shall have no authority to request an autopsy by the State Crime Laboratory." However, the Pulaski County

Coroner, Steve Nawojczyk, testified that he went to the crime scene, observed the body, and ordered it photographed and sent to the crime lab. As he is the coroner of the county where the body was discovered, there was no violation of Ark. Code Ann. § 12-12-318 (1987), and the trial court did not err in admitting the results of the autopsy.

## FOUNDATION FOR MEDICAL EXAMINER'S TESTIMONY

Cavin submits that the trial court erred in overruling his objection to the foundation for the Medical Examiner's testimony concerning the number of blows to the decedent's head. Although the murder weapon was never found, Dr. Violet Hnilica, a forensic pathologist with the Arkansas Medical Examiner, testified that she believed with a reasonable degree of medical certainty that Todd's head received blunt trauma at least five or ten times. She formed her opinion based upon the appearance of the wounds. Cavin claims that he objected to this conclusion based upon insufficient foundation, contending that forming an opinion as to the cause of death without possessing the actual weapon used was mere speculation. Yet, the record reveals that Cavin's actual objection was as follows:

Q. Do you have an opinion about how many times this body was hit?

MR. PRICE: Objection, Your Honor. Foundation.

THE COURT: All right, If it's an expert opinion counsel, you must keep it within the framework.

BY MISS LODGE:

Q. Do you have an opinion within a reasonable degree of medical certainty how many times this head area, just the head area that we're speaking about, received blunt trauma?

A. Well, the back of the head I counted at least five, and the front of the head at least five, so I'd say at least 10.

MR. PRICE: May we approach the bench, Your Honor?

THE COURT: Yes. (THEREUPON, out of the hearing of the jury, the following conversation took place between

counsel and the Court.)

MR. PRICE: My objection to foundation is that they have not laid any foundation as to what kind of weapon it was that caused this. In other words, if she has 10 lacerations, it could have been something with five prongs that hit him with two blows. It's rank speculation without a foundation as to what type of weapon was used and whether she's compared it.

THE COURT: All right. That's going to be overruled.

At trial, Cavin's objection to foundation was that the State had not laid any foundation as to what kind of weapon caused the wounds. The State contends that Cavin failed to object on this point. Although we hold that Cavin's objection was sufficient to preserve this issue for consideration on appeal, we disagree that the trial court erred in overruling the objection.

A proper foundation for Dr. Hnilica's testimony as to the number of blows inflicted on the victim was established. She first described the victim's head injuries in detail and then proceeded to explain how she could determine from these injuries the approximate amount of blunt trauma inflicted. Based on this testimony, we hold that a proper foundation was established.

## OUT-OF-COURT STATEMENT

For his next argument, Cavin claims that the trial court erred in denying his motion to suppress his out-of-court statement to Detective Ron Tucker because he invoked his right to an attorney while being questioned.

While being interrogated and after he had signed a rights form, Cavin asked the officers if they thought that he should ask for an attorney. Detective Tucker testified at trial that Cavin did not appear intoxicated at the time. Tucker stated that he did not give Cavin a direct answer to his question because he felt he could not make that decision for him. Detective Tucker further inquired a to whether Cavin wished to continue and tell the truth, and the appellant answered affirmatively.

Cavin testified that his question about needing an attorney was never answered and that he was never given the opportunity to talk to a lawyer. He also contends that he asked them to do a

blood test to determine whether drugs or alcohol were in his system, but he did not get one. He claims that his statement should be suppressed because he was denied his right to counsel.

■ The State notes that it did not introduce the contents of the statement in its case-in-chief. On direct examination by the State, Detective Tucker did make reference to having taken a statement. However, Cavin was the one who introduced large portions of the statement on his cross-examination of Detective Tucker. At that point, the State introduced the tape in its entirety. One who opens up a line of questioning or is responsible for error should not be heard to complain of that for which he is responsible. *Berry* v. *State*, 278 Ark. 578, 647 S.W.2d 453 (1983).

### JURY INSTRUCTIONS

Cavin also claims that the trial court erred in refusing his requested jury instruction, a modified version of AMCI 106 dealing with circumstantial evidence. At trial, Cavin requested that a modified version of AMCI 106 should have been given to the jury. The last sentence of AMCI 106 states, "However, circumstantial evidence must be consistent with the guilt of the defendant and inconsistent with any other reasonable conclusion." Cavin wanted the trial court to give a modified version of this, asking that the words "offered by the State" be inserted after the word "evidence." He also wanted the following added to the end of the instruction: "If you view the evidence in this case as reasonably supporting either of two conclusions — one of innocence, the other of guilt — you must adopt the conclusion of innocence and find the defendant not guilty."

The trial court refused Cavin's requested instruction, finding that AMCI 106 as framed was sufficient and that the requested language told the jury it should ignore direct evidence of guilt if they could draw two conclusions from the circumstantial evidence.

■ It is not error for the trial court to refuse to give a non-AMCI jury instruction if the other instruction given covered the issue. *See Williams* v. *State*, 304 Ark. 279, 801 S.W.2d 296 (1990); *Henderson* v. *State*, 284 Ark. 493, 684 S.W.2d 231 (1985). An instruction not included in AMCI should be given

only when the trial judge finds that the AMCI instruction does not state the law of if AMCI does not contain a needed instruction on the subject. *Ventress v. State*, 303 Ark. 194, 794 S.W.2d 619 (1990).

Clearly, AMCI covered the issue of circumstantial evidence in this case. It is not necessary to create a distinction between circumstantial evidence offered by the State and that offered by Cavin. Also, the additional language offered by Cavin was properly not given to the jury because it was a comment on the direct evidence as well as the circumstantial evidence. In addition, as the State notes, this language overlaps the instruction on reasonable doubt, which along with AMCI 106, adequately states the law on this issue. *See Morgan v. State*, 273 Ark. 252, 618 S.W.2d 161 (1981). Accordingly, we hold that the trial court was correct in refusing Cavin's requested modification of AMCI 106.

Cavin also contends that the trial court erred in refusing the following jury instruction regarding the character of the weapon used:

> When considering whether or not the Defendant acted with purposeful criminal intent, you may consider all of the circumstances of the case, such as the character of the weapon used and the manner in which it was used, the nature of the wounds inflicted, the conduct of the accused and the like.

The trial court refused Cavin's requested instruction finding that other instructions adequately covered the subject matter.

Cavin argues that such a ruling was erroneous because he wanted to emphasize to the jury, in support of his affirmative defense of justification, that none of the items suspected of having been used as a weapon could be considered a weapon of choice that someone would be expected to use against another person, unless they had to so hastily, such as when defending against a sudden attack.

However, AMCI 101 (c) and (d) were given, and they address these things:

> It is your duty to determine the facts from the evidence

produced in this trial. . .Render your verdict upon the evidence and the law. . .In deciding the issues, you should consider the testimony of the witnesses and exhibits received in evidence.

When the matters addressed in a proffered instruction have been adequately covered in other instructions, it is not error to refuse that instruction. *Morgan* v. *State* 273 Ark. 252, 618 S.W.2d 161 (1981).

Cavin's final argument on appeal also involves a jury instruction, and this issue arises due to the Sheriff's refusal to give him a blood test. Cavin claims that when he was first taken into custody by the Pulaski County Sheriff's office, he told Deputy Ron Tucker that he was very intoxicated the previous evening and had been injected with unknown drugs. He asked Tucker to give him a blood test, but this request was refused.

Cavin now complains that the Sheriff's failure to take a blood test before taking his statement amounted to withholding evidence from him. As a result, a presumption arises that the results of this blood test would be unfavorable to the State. Citing *Watts* v. *State*, 222 Ark. 427, 261 S.W.2d 402 (1953) and *Bell* v. *State*, 243 Ark. 839, 422 S.W.2d 668 (1968), Cavin requested that the jury be instructed about this presumption:

> You are instructed that the unexplained failure of the State to produce evidence which is in the exclusive control of the State raises a presumption that the evidence would be unfavorable to the State.

However, the trial court refused this instruction, explaining that:

> [T]o give the jury a presumption in the form of an instruction as you've offered, you're instructed that the unexplained failure of a party, this also includes the Defendant, to produce evidence which is within the exclusive control of that party raises a presumption that evidence would be unfavorable to the party withholding it.

> I'm not by any means telling you that you can't argue that well, they had the blood test, and they should have produced it, and so forth. And you should say that goes

against the State that's unfavorable. They would have produced it. Most certainly you can argue that. . . .I believe to go further with this matter would just be belaboring the issue. . . .

We hold that since *Bell* and *Watts* do not stand for the proposition which Cavin asserts in his proffered instruction, the trial court did not err in refusing the instruction. To have instructed the jury in such a way would have been to make an incorrect statement of the law.

*Watts* involves a case in which the State mentioned the existence of a hair comparison test done on the defendant and a strand of hair found at the crime scene. The State had not revealed the test results to the defense. In reversing the conviction, this court stated that although the trial court told the jury to disregard any testimony about the test results, the court should have permitted the defendant to argue to the jury that the failure to the State to introduce the available report created a presumption that if introduced, it would favor the defendant.

Similarly, in *Bell*, *supra* the defendant told the judge that he had unnamed witnesses who, if present, would have testified that the deceased had no money, therefore eliminating the motive for robbery. Bell claimed that during the trial, he asked the Sheriff and the court to find these witnesses for him. At a post-trial hearing on whether the trial court erred in not calling these witnesses, the defendant had the opportunity to call numerous individuals present at his trial who allegedly witnessed his requests of the court, but he failed to do so. This court held that the failure to produce an available witness who allegedly had knowledge of defendant's request for certain witnesses to be brought into court to testify in defendant's behalf and were not produced, creates a presumption that the testimony, if produced, would be unfavorable.

Unlike the comparative hair test results in *Watts* and the witnesses in *Bell*, Cavin's blood tests were not available. After all, the test had never been taken. Accordingly, we hold that *Watts* and *Bell* are not applicable, and the trial court did not commit error in refusing the proffered instruction.

The record has been examined in accordance with Ark. Sup.

Ct. R. 4-3(h), and it has been determined that there were no rulings adverse to the appellant which constituted prejudicial error.

Affirmed.