Stacey Eugene JOHNSON *v.* STATE of Arkansas

CR 98-743                                    27 S.W.3d 405

Supreme Court of Arkansas
Opinion delivered October 5, 2000
[Petition for rehearing denied November 2, 2000.* ]

* BROWN, J., would grant.

*Jeff Rosenzweig*, for appellant.

*Mark Pryor*, Att'y Gen., by: *James R. Gowen, Jr.*, Ass't Att'y Gen., and *Michael C. Angel*, Ass't Att'y Gen., for appellee.

W.H. "DUB" ARNOLD, Chief Justice. In 1994, appellant Stacey Eugene Johnson was convicted of capital murder in Sevier County Circuit Court in the death of Carol Heath. He was sentenced to death. In *Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996), hereinafter referred to as *Johnson I*, this Court reversed his conviction on the ground that the trial court had improperly admitted an out-of-court statement allegedly made by six-year-old Ashley Heath, daughter of the victim, in which Ashley claimed she had witnessed the murder of her mother and purported to identify appellant as the murderer. Ashley Heath had been found incompetent to testify at that trial.

A retrial was held in November 1997 in Pike County, venue having been changed. In this trial, Ashley Heath was found competent to testify and did testify. Appellant was again sentenced to death. It is from that conviction and sentence that the instant appeal is brought. Appellant raises multiple bases for reversal, which are as follows:

1) The trial court erred in denying Johnson access to the records of examination and treatment of the child witness conducted after the first trial;

2) The trial court erred in permitting introduction of victim-impact evidence;
3) The trial court erred in denying Johnson the right to present evidence that another person may have committed the offense;
4) The trial court erred in permitting introduction of the child's out-of-court statements;
5) The trial court should have suppressed Johnson's statements.

We disagree with appellant that the trial court erred and affirm the judgment of conviction and death sentence imposed.

Carol Heath was brutally murdered in her duplex apartment in DeQueen on either the night of April 1, 1993, or the early morning hours of April 2, 1993. She was beaten, strangled, and had her throat slit while her two young children, Ashley, age six, and Jonathan, age two, were home. The facts regarding the murder and its aftermath are gleaned from pretrial and trial testimony. At approximately 6:45 a.m. on April 2, 1993, Rose Cassidy, the victim's sister-in-law, knocked on the victim's door but did not receive an answer. Because the door was unlocked, she entered and found Carol Heath's partially nude body lying on the living room floor in a pool of blood. She ran across the street to call the police and then returned to check on her niece (Ashley) and nephew (Jonathan), whom she saw looking out the bedroom window. Cassidy testified that she asked Ashley what had happened. Ashley responded, according to Cassidy: "[S]omebody had broke in, and I said who, and she (Ashley) said a [b]lack man." The victim was white.

Sergeant Keith Tucker of the DeQueen Police Department testified that he found Carol Heath's body nude except for a t-shirt that had been pushed up around her neck. He stated that her body was located between a couch which was tilted up on its back legs and a coffee table which had apparently been moved toward the middle of the room. DeQueen Chief of Police James Smith arrived at the apartment later. He testified that when he pulled the t-shirt away from the victim's neck, he saw that her throat had been slashed.

Dr. Frank Peretti, an associate medical examiner for the State Crime Laboratory, testified that Carol Heath's death was caused by cutting her neck, strangulation, and blunt-force head injuries. He stated that her attacker left a four-inch by two-inch cut wound on her neck that went one-quarter inch into her spine. He observed

that she had several bruises and abrasions on her head and face, that she had injuries on her hands and arms consistent with defensive wounds, that she had a bite mark on the nipple of her right breast and an abrasion on her left breast, and that there was a one-quarter-inch contusion on her right labia minora. Dr. Peretti could not conclude, based on the physical evidence, that she had been either sexually assaulted or raped.

Officer James Behling, a criminal investigator with the DeQueen Police Department, testified that he observed a pair of panties next to Carol Heath's right thigh. He noted an area of lighter-colored liquid between and around the legs and below the genital area of the victim. An empty douche bottle and an empty "Lifestyles" condom box were found in the bathroom sink.

On April 5, 1993, Kenneth Bryan found a purse in the woods between DeQueen and Horatio which he later realized belonged to the victim. He took Officer Behling to the location. Officer Behling examined the area and found a bloody pullover green shirt, a bloody white t-shirt, and a bloody towel. Lisa Sakevicius, an expert with the State Crime Laboratory's trace evidence section, testified that hairs microscopically similar to the victim's hair were found on all three of these items. She further testified that hairs retrieved from under the victim's left breast, from the floor by the victim, and from the white t-shirt were of Negroid origin. Jane Parsons, a forensic serologist, testified for the State that no semen was found in connection with the victim. She admitted that the finding of semen would be unlikely, if the perpetrator used a condom and douched the victim.

DNA evidence was introduced at trial. Melisa Weber, a staff molecular biologist at Cellmark Diagnostics, conducted a Restriction Fragment Length Polymorphism [RFLP] test on the green shirt for the State and testified that to a reasonable degree of scientific certainty the blood matched that of Carol Heath. She also conducted a Polymerase Chain Reaction [PCR] test on several items, including the white t-shirt found in the park, a cigarette butt found in the green shirt, and hairs taken from the body of Carol Heath and near to where the body was located. With respect to the white t-shirt, Weber testified that the victim could not be excluded as the source of the blood and that the probability of this DNA having come from another Caucasian was 1 in 12,000. With

respect to the cigarette butt and hairs, Weber opined that Johnson could not be excluded and that the probability that another African-American was the donor of the DNA in question was 1 in 250.

Officer Hayes McWhirter, an investigator with the Arkansas State Police, talked with the victim's daughter, Ashley Heath, on the afternoon of April 2, 1993. Also present at the time was Cynthia Emerson, a supervisor with the Department of Human Services. Officer McWhirter made the following notes from that conversation and used these notes to refer to when he testified at the pretrial hearings and at trial:

> Ashley stated her mother and I were on the couch when someone knocked on the door. She got up and opened the door. The picture No. 3, Stacey Johnson, is the one that came in the door.[1] Ashley looked at six different pictures of black males. Mother likes Branson. He works at In Your Ear. The black male asked where Branson was. The black male used a girl sounding name. He had on a black hat with something hanging down in the back. He had on a green shirt and sweater. When they were talking, the black male said he had just got out of jail. The black male was mad at mother for dating Branson. He had been over two other times, but it was a while or a long time ago. The black male had about as much hair as [McWhirter]. I saw them fighting. Then I saw mother laying on the floor. I saw the black male leave and he got up and he got in a brown truck, I think. I saw a knife and a gun. The brown truck was parked beside the house. Mother looked out the window. When he knocked, then she let him in. While mother was laying on the floor, the black male walked into the bathroom. We were hiding in the closet. I came out the door to the bathroom and the black male had a knife in his hand beside mommy. She was on the floor bleeding. After he left, I went in and saw momma bleeding. Jonathan looked at mommy twice. She was covered in blood. We went to bed and then this morning when someone knocked on the door, I was scared to open the door. When Rose screamed, I knew she saw mommy with blood all over her. Every time I saw the black male, he had clothes on.

Officer McWhirter testified that he handed Ashley a stack of seven photographs, and she picked Johnson out of the photo lineup twice. Johnson was subsequently arrested in Albuquerque, New Mexico.

---

[1] This statement was the basis of the reversal of *Johnson I*. However, no objection was made to such statement at the appellant's second trial in this matter.

## I. Privilege and Waiver.

Prior to the first trial in this matter, child eyewitness Ashley Heath had waived the psychotherapist/patient privilege, thereby allowing the defense access to the records obtained by and through her psychotherapist at the time, Dr. Carnelle Barnes. However, subsequent to the reversal of the first conviction, and prior to retrial of the matter, Ashley Heath obtained a new therapist, Jill Smith, for the purpose of treating the emotional condition brought on by her mother's death. At the second trial, Ashley's attorney *ad litem* asserted the psychotherapist/patient privilege on Ashley's behalf, thereby denying access to the defense of any records of any therapy she received subsequent to the first trial.

Appellant moved for access to these records, contending that such discovery was necessary for him to adequately present his defense. The trial court denied appellant's motion, ruling that said information was privileged. Appellant asserts that the refusal of the trial court to permit access to this evidence denied him his right to present his defense by depriving him of the ability and tools:

a) to challenge the witness's competency at the competency hearing;
b) to challenge her competency and veracity before the jury, both in cross-examination and in presentation of impeachment evidence; and
c) to make an adequate demonstration of the need for access to a defense expert.

We disagree.

The child was deemed incompetent as a witness at the first trial because the court was unable to even get her into the courtroom, much less conduct a hearing to test her competency by asking her questions, directly, regarding her ability to appreciate telling the truth on the witness stand. The trial court, in the first trial, relied heavily on the testimony of Dr. Carnelle Barnes, who testified at the competency hearing about the psychological trauma Ashley had experienced and what further trauma she would experience if she were compelled to testify.

Due to Ashley's unavailability as a witness at that competency hearing, the trial court based its determination that Ashley was incompetent to testify on Dr. Barnes's testimony and the prosecu-

tor's statements to the court that Ashley would not answer any questions for the purposes of that hearing. Ashley was deemed incompetent and Dr. Barnes's records were made available. Further, appellant had every opportunity and indeed did cross-examine Dr. Barnes heavily regarding both issues of Ashley Heath's competency as well as her veracity.

■■ The defense had in this case, prior to the *second* trial, the opportunity to cross-examine the child herself at the competency hearing, as the child *was* present and available for questioning at that time. The trial judge, in his discretion, deemed Ashley to be competent at the second trial based on her availability and willingness to be present for the hearing and her demonstration to the court of an understanding of the obligation of the oath and the consequences of false swearing, as well as her capacity to transmit to the factfinder a reasonable statement of what was seen or heard. *See Jackson v. State*, 290 Ark. 375, 720 S.W.2d 282 (1986). The competency of a witness is a matter lying within the sound discretion of the trial court and, in the absence of clear abuse, we will not reverse on appeal. *Logan v. State*, 299 Ark. 266, 773 S.W.2d 413 (1989); *Hoggard v. State*, 277 Ark. 117, 640 S.W.2d 102 (1982). Access to the requested records of her second therapist would have in no way aided the defense in challenging whether or not the child was able to appreciate telling the truth on the witness stand, as the child was herself present and available for cross-examination on this point. Therefore, in regard to the issue of the child's competency, the records sought were clearly irrelevant and therefore inadmissible for the purpose of challenging her competency at the second trial.

Next, although the information sought could certainly be deemed *relevant* for purposes of challenging the witness's veracity both in cross-examination and in presentation of impeachment evidence, the question is whether the records were *admissible*. The trial court found that it was not admissible because it was privileged under Ark. R. Evid. 503. Appellant contends that because the witness had waived the psychotherapist/patient privilege prior to the first trial, then the privilege is forever waived and the witness may not now claim the privilege. The appellant further contends that the witness's assertion of the privilege interfered with his right to present a complete defense at trial. We hold these arguments to be without merit for the following reasons.

Ark. R. Evid. 503(b) (1999) states:

> A patient has a privilege to refuse to disclose and to prevent any other person from disclosing his medical records or confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

The foregoing privilege applies in both criminal and civil cases, *e.g., Baker v. State*, 276 Ark. 193, 637 S.W.2d 522 (1982), and is inapplicable only when proceedings are initiated to hospitalize the patient for mental illness, when a mental examination is ordered by the court, or when the patient relies on his or her physical, mental, or emotional condition as an element of his or her claim or defense. Ark. R. Evid. 503(d)(1),(2), and (3) (1999).

The appellant contends that this privilege was inapplicable pursuant to Rule 503(d)(3)(A) because Ashley's emotional condition was an element of her claim or defense. However, Rule 503(d)(3)(A) clearly anticipates that the privilege is inapplicable only as to a *party* to a proceeding who brings his or her own physical, mental, or emotional condition into issue. *See Cavin v. State*, 313 Ark. 238, 855 S.W.2d 285 (1993). Ashley was not and is not a party to the proceedings below, and therefore could not assert a claim or defense. If this Court were to follow appellant's reasoning, a third party could always circumvent Rule 503 by calling into question *any* witness's mental or emotional condition. Such a result is clearly not intended by this rule, the purpose of which is to limit access to confidential communications. We therefore hold that because Ashley Heath was not a party to the proceedings and did nothing to bring her own emotional condition into issue, she properly asserted her psychotherapist/patient privilege.

The appellant further argues that because the privilege was waived by the witness at the first trial, it must be deemed "waived" at the second trial. This Court has long held that waiver of the privilege in one proceeding does not constitute waiver of the privilege at subsequent proceedings. *See Maryland Casualty Co. v Maloney*, 119 Ark. 434, 178 S.W. 387 (1915). Although the *Maloney* decision was rendered long ago, this Court's ruling in that case is

dispositive of the waiver issue. There, it was held that the patient's waiver at the first trial did not serve as a waiver at retrial, *even as to the privileged material that was disclosed at the first trial. Id.* at 441, 178 S.W. at 389.

■ From the holding in *Maloney,* it logically follows that if a patient is entitled to assert the privilege at a subsequent proceeding *as to previously disclosed material,* then a patient with a new body of privileged material may also assert the privilege. After all, the privilege exists between the patient and the psychotherapist, not between the patient and an *issue* in the case. The facts present in the instant case are even stronger on this point than *Maloney,* as the previously disclosed material in this case, that being the records of Dr. Barnes, were still made available at the second trial and were not asserted to be privileged; only the new body of material from the new therapist was asserted by the witness to be privileged and not subject to disclosure.

■ Between the appellant's first trial and his retrial, Ashley Heath obtained a new psychotherapist, thus creating a new set of privileged therapy records and communications. Indeed, in light of *Maloney,* the trial court could have properly ruled that the records made prior to the appellant's *first* trial were subject to the privilege at retrial as well. However, to the appellant's benefit, it applied the privilege only to the material created after his first trial. Clearly, applying the holding in *Maloney,* this was not error.

The appellant further makes several arguments which, taken together, essentially allege that the assertion of the privilege interfered with his right to present a complete defense. Specifically, the appellant contends that the privileged material was admissible evidence of bias, knowledge, or interest of the witness, that the material was discoverable under Ark. R. Crim. P. 17.1 and 17.4 (1999), and that the constitutional right to present his defense superseded Ashley Heath's right to the psychotherapist/patient privilege. Contrary to appellant's arguments, however, it has been established that said privilege preempts the need to discover all admissible evidence.

■ The United States Supreme Court established in *Jaffee v. Redmond,* 518 U.S. 1 (1996), that the psychotherapist/patient privilege is paramount to the need to gain access to the privileged

material for evidentiary purposes. There, the Court stated the following:

> Exceptions from the general rule disfavoring testimonial privileges may be justified . . . by a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth. Guided by these principles, the question we address today is whether a privilege protecting confidential communications between a psychotherapist and her patient promotes sufficiently important interests to outweigh the need for probative evidence . . . . Both reason and experience persuade us that it does . . . .
>
> In contrast to the significant public and private interests supporting recognition of the privilege, the likely evidentiary benefit that would result from the denial of the privilege is modest. If the privilege were rejected, confidential conversations between psychotherapists and their patients would surely be chilled, particularly when it is obvious that the circumstances that give rise to the need for treatment will probably result in litigation. Without a privilege, much of the desirable evidence to which litigants . . . seek access . . . is unlikely to come into being. This unspoken "evidence" will therefore serve no greater truth-seeking function than if it had been spoken and privileged.

*Id.* at 9-10, 11-12 (citations and quotations omitted). Although the decision in *Jaffee* acknowledged the *federal* privilege, it soundly rejected arguments such as the appellant's present contention that his constitutional right to present a defense supersedes the psychotherapist/patient privilege. *Jaffee* explicitly states that the privilege is more important than "the need for probative evidence." *Id.* at 9-10.

■ The appellant argues that Ashley's psychotherapy records were discoverable pursuant to Ark. R. Crim. P. 17.1 and 17.4 and *Brady v. Maryland*, 373 U.S. 83 (1963). However, that argument presupposes that the State had access to or knowledge of the records and their contents. Ark. Rule Crim. P. 17.1 places a duty on the State to disclose to the defense relevant or exculpatory material "which is or may come within [its] possession, control, or knowledge[.]" Here, the appellant has not shown that the State had access to the records sought. In fact, Ashley's assertion of her privilege would have precluded disclosure to the State as well as to the appellant. In the absence of a showing by the appellant that the

State had access to the records, we hold that no *Brady* violation occurred.

Finally, the appellant attempts to lend support to his arguments by referring to the *contents* of the privileged records. This reference will not be considered. According to the plain language of Rule 503, records made during the course of treatment and not falling under one of the enumerated exceptions are subject to absolute privilege *without regard to their content*. As the appellant can not claim that the records were not made in the course of treatment, his references to their content is irrelevant to the determination of this case.

In short, Ashley Heath's psychotherapy records were not relevant for a determination of her competency to testify at the second trial and were subject to the psychotherapist/patient privilege; she did not waive the privilege simply because she had waived it in the first trial; and the privilege outweighs the appellant's right to present a defense. Therefore, we hold that the trial court's decision to deny the appellant access to these records was proper and shall be affirmed.

## II. Victim-impact evidence.

For his next point on appeal, appellant asserts that the trial court erred in overruling his objection to Warren Eckert's victim-impact testimony regarding the victim's religious activities. The appellant also contends that, although no objection was made at trial, Carolyn Pullen should not have been allowed to read into evidence the statement of Ashley Heath. Finally, the appellant argues that the introduction of victim-impact evidence in the sentencing phase of his trial "violated prohibitions against *ex post facto* evidence." The State contends that the appellant's victim-impact arguments are barred, or alternatively, are without merit. We agree with the State and affirm the trial court on this point, as well.

### A. Testimony of Warren Eckert.

During the sentencing phase of the trial, the State elicited victim-impact testimony from Warren Eckert. In response to a question posed by the State to Mr. Eckert regarding the victim's

religious activities, the appellant simply stated, "Your Honor, I object to any introduction with religion." The trial court overruled the objection, allowing Mr. Eckert to testify regarding Ms. Heath's involvement in her church. During Mr. Eckert's subsequent testimony, the appellant requested a bench conference, where he made the following objection:

> Your Honor, I object to this entire line of testimony. This is not permissible under any circumstances. It's not an aggravating circumstance of any statute and its [sic] not a victim-impact statement by law. This is just him telling the jury about the victim and her tactics and such.

After a brief discussion, the trial court again overruled the appellant's objection. Mr. Eckert then testified that Ms. Heath regularly rode to church with her children on the church bus and that she had volunteered to substitute for an absent Bible class teacher on more than one occasion.

The appellant now contends that the trial court erred when it allowed Mr. Eckert to testify about Ms. Heath's religious activities because such evidence was irrelevant under Ark. R. Evid. 401, 402, and 403 (1999) and inadmissible pursuant to Ark. R. Evid. 610 (1999). However, the appellant did not make the specific arguments below that he now advances. It is well settled by this Court that parties are bound on appeal by the scope and nature of their objections at trial. *E.g., Ayers v. State*, 334 Ark. 258, 264, 975 S.W.2d 88, 91 (1998). Because appellant's arguments on appeal clearly exceed the scope and nature of his objections at trial, his arguments in this regard are barred.

### B. Carolyn Pullen's reading of statement.

Appellant next asserts that the court erred when it allowed a purported hearsay statement to be read into evidence. However, the appellant admits first that he failed to object to this statement at trial. This Court will not reverse in the absence of an appropriate contemporaneous objection in the trial court. *E.g., Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000). Although there are four narrow exceptions to the contemporaneous-objection rule, *e.g. Camargo v. State*, 327 Ark. 631, 640, 940 S.W.2d 464, 469

(1997), none are applicable in this regard, and the appellant's failure to object precludes appellate review.

■ Moreover, appellant has failed to offer any argument or authority in support of his assignment of error in this regard. Because assignments of error unsupported by convincing argument or apposite authority will not be considered on appeal, *e.g., Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997), appellant's point in this regard is barred from this Court's consideration.

## C. Ex post facto *evidence.*

■ For his final argument regarding victim-impact evidence, the appellant asserts that the *ex post facto* clause of the United States and Arkansas constitutions precluded the use of victim-impact evidence at trial because Ark. Code Ann. § 5-4-602 (4) (Repl. 1997) was enacted after Ms. Heath's murder but prior to the appellant's trial. However, appellant admittedly failed to object to the victim-impact testimony on this ground at trial; as such, this argument is, likewise, barred on appeal. *See Ayers v. State, supra.*

■ Moreover, this Court previously rejected this argument by appellant in *Johnson I*; therefore, the law-of-the-case doctrine precludes further review. *Johnson I*, 326 Ark. 450, 934 S.W.2d at 189. In *Camargo v. State*, 337 Ark. 105, 987 S.W.2d 680 (1999), this Court stated the following:

> The law-of-the-case doctrine ordinarily arises in the case of a second appeal and requires that matters decided in the first appeal be considered concluded. The doctrine is not inflexible and does not absolutely preclude correction of error, but it prevents an issue raised in a prior appeal from being raised in a subsequent appeal unless the evidence materially varies between the two appeals.

337 Ark. at 109-10, 987 S.W.2d at 683 (citations and quotations omitted).

■ In *Johnson I*, we held that by expanding the scope of permissible evidence during the penalty phase, the General Assembly has not expanded the scope of punishment or added a new aggravating circumstance. Therefore, we held that permitting this testimony did not constitute an *ex post facto* law. Here, the appellant reasserts his *ex post facto* clause challenge to the admission of victim-

impact evidence. Yet, there have been no substantive changes in the law nor material variances in the evidence between the appellant's first appeal and this appeal. Therefore, the law-of-the-case doctrine precludes review of this argument.

### III. Evidence that another person may have committed the offense.

For his third point on appeal, the appellant contends that the trial court erred when it refused to allow him to introduce the testimony of Cordelia Vinyard, ex-wife of Branson Ramsey, as evidence that Ramsey murdered Ms. Heath. The evidence adduced at trial showed that Ms. Heath had bite marks on her breasts. Further, the appellant elicited testimony from Dr. Carnelle Barnes, indicating that Ashley Heath may have seen Ramsey and Johnson together at Ms. Heath's home on the night of the murder. Based on that evidence, the appellant attempted to introduce *Vinyard's* testimony that Ramsey had physically abused *her*, including biting her breast, while the two were married. The trial court refused to allow Ms. Vinyard to testify, and the appellant now challenges that ruling.

It is well settled that a trial court is vested with wide discretion in admitting evidence, and this Court will not reverse in the absence of an abuse of that discretion. *E.g., Ward v. State*, 338 Ark. 619, 1 S.W.3d 1 (1999). In addressing the admissibility of evidence that a third party committed a particular crime, this Court has held as follows:

> A defendant may introduce evidence tending to show that someone other than the defendant committed the crime charged, but such evidence is inadmissible unless it points directly to the guilt of the third party. *Evidence which does no more than create an inference or conjecture as to another's guilt is inadmissible.*

*Zinger v. State*, 313 Ark. 70, 75, 852 S.W.2d 320, 323 (1993) (quoting *State v. Wilson*, 367 S.E.2d 589 (N.C. 1988)) (emphasis added). This Court went on to state:

> . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.

*Zinger*, 313 Ark. at 76, 852 S.W.2d at 323 (quoting *People v. Kaurish*, 802 P.2d 278 (Cal. 1990)).

■ The appellant sought to have Vinyard's testimony introduced for the purpose of proving that Ramsey had previously bitten her breast. Although Ms. Heath's autopsy revealed that she had bite marks on her breast, the fact that Ramsey had bitten *Vinyard* on a previous occasion created at most only an *inference* of Ramsey's guilt. Indeed, it is untenable to assert that Vinyard's testimony directly implicated Ramsey in the murder of Ms. Heath, which is the prerequisite for admitting any evidence of a third party's guilt. Clearly, the trial court did not abuse its discretion in refusing to allow Ms. Vinyard's testimony.

*IV. Introduction of out-of-court statements.*

■ For his fourth point on appeal, the appellant contends that the trial court erroneously permitted the State to introduce Ashley Heath's statement to Hayes McWhirter and Cynthia Emerson as an excited utterance. However, the appellant's allegation is again barred from appellate review because it is unsupported by argument or authority. The appellant has not included in his brief any argument or legal support for his contention that the statement was hearsay and did not fit under the excited–utterance exception to the hearsay rule. Instead, appellant makes the bare assertion that the statement in question was impermissible hearsay evidence and did not constitute an excited utterance. That assertion alone is insufficient.

■ More importantly, however, this issue also is precluded from appellate review because it was decided in *Johnson I.* There, in response to the appellant's argument that Ashley's statement to McWhirter and Emerson was hearsay, this Court held that we do not view the statement by Ashley made more than nine hours after her mother's body was discovered and she was removed from the apartment as inconsistent with the spontaneity and impulsiveness associated with an excited utterance. *Johnson I,* 326 Ark. at 443, 934 S.W.2d at 185. Again, the law–of–the–case doctrine precludes review of issues concluded in a prior appeal unless there has been an intervening material change in the evidence. *See Camargo, supra.*

Here, there has been no such change in the evidence. Recognizing that fact, appellant makes an unpersuasive attempt to convince this Court to ignore the law-of-the-case doctrine and review this issue again. We decline to do so.

*V. Suppression of appellant's statements.*

█ For his final point on appeal, appellant asserts that the trial court should have suppressed his confession. However, the appellant admits that his argument is not preserved for appellate review and "must await retrial or a Rule 37 hearing." Therefore, because the appellant does not argue for reversal, and this Court will not reverse for plain error, *see Green v. State*, 330 Ark. 458, 956 S.W.2d 849 (1997), it cannot be held that the trial court erred in refusing to suppress the appellant's confession.

*VI. Rule 4-3(h) Compliance.*

The record has been reviewed for prejudicial error pursuant to Ark. Sup. Ct. R. 4-3(h), and no reversible errors were found.

For all of the above reasons, we hereby affirm the conviction and death sentence of appellant Stacey Eugene Johnson on the charge of capital murder.

Affirmed.

BROWN, IMBER, and THORNTON, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. The pivotal issue in this death case is the waiver of the medical privilege by Ashley's guardian *ad litem* for Dr. Carnelle Barnes's records and testimony and whether this waiver extended to the records of a second therapist, Jill Smith. Under these facts, I conclude that the waiver does apply to Smith. The alternative would be to allow Ashley's guardian and the State to pick and choose which therapist will be most helpful at trial and prevent a less favorable therapist from testifying. The guardian for the key State witness and the State should not be permitted to use the waiver of the medical privilege as a sword to allow the testimony of one therapist and as a shield to prevent that of another. That is what was done at the

second trial of Stacey Johnson, and for that reason, I respectfully dissent.

Prior to the first trial in 1994, the guardian *ad litem* for Ashley waived the medical privilege for Dr. Carnelle Barnes, a psychologist, and permitted her to testify. At the competency hearing, Dr. Barnes testified that Ashley would suffer mental damage if she were compelled to testify. She also testified that Ashley could not accurately recall what happened a year ago and that there was a strong possibility her memory was contaminated and diluted by what she had heard and by her dreams. She further stated that Ashley was embellishing on the truth and telling different stories. Based on Dr. Barnes's testimony and that of the prosecutor, the trial court ruled Ashley incompetent to testify. The prosecutor went to trial with a battery of hearsay witnesses who told the jury what Ashley had told them the day of the murder. Johnson was convicted and sentenced to death. This court reversed that judgment in 1996 and remanded for a new trial because of unreliable hearsay testimony stemming from Ashley's selection of Johnson from a photo lineup. *Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996).

Ashley began seeing a new therapist, Jill Smith of the Southwest Arkansas Counseling and Mental Health Center, on November 12, 1996. Her treatment lasted through the second trial which took place in November 1997 and up until April 9, 1998. The guardian *ad litem* refused to waive the medical privilege for Smith over defense counsel's strong objection. Indeed, defense counsel even subpoenaed Smith for the retrial, but the trial court quashed the subpoena based on the privilege. The result was that Johnson's counsel was denied access to Smith's record and evaluations, while Dr. Barnes was again allowed to testify at the second trial.

Why was the Smith information so critical? The short answer is that the prosecution only called Ashley as a witness at the competency hearing before the second trial, and the trial court deemed her competent to testify. Had defense counsel been privy to Jill Smith's records, he would have been able to delve into Smith's conclusions that Ashley's stories were profoundly inconsistent and that she had been under considerable pressure from her family and the prosecutor to convict Stacey Johnson. A sampling of Smith's notations after therapy sessions with Ashley before the second trial reveals the following:

- The DA says she's the only one who can "keep him behind bars."

- So much of what Ashley says is parroting other family members. For example, she says, "I'm the only one who can put him behind bars."

- Her grandmother told Ashley that she "has to keep him behind bars," because if he gets out he'll try to kill Ashley next.

- Her grandmother emphasized how much responsibility was on her, and if Johnson's sentence is overturned, Ashley will feel total responsibility.

- Ashley kept wanting to elaborate on what she saw. Atty emphasized to her that all she has to say is that she saw Jason (sic) murder her mom, period.[1]

Because he was denied access to Smith's records, defense counsel was unable to confront and cross-examine Ashley on duress and bias due to considerable family and prosecutorial pressure, much less emphasize her unreliability due to inconsistent stories.

The majority opinion gives short shrift to the waiver issue. Yet that issue represents the crux of Johnson's appeal. Rule 510 of the Arkansas Rules of Evidence provides:

> A person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged.

By its opinion the majority endorses the State's position that Ashley's guardian should be able to pick and choose which therapist will testify and be made available to the defense. That should not be. It stands to reason that if Ashley's guardian waives the privilege for one key psychotherapist, that waiver should apply to a successive therapist who also treated her to cope with her mother's savage murder before the second trial. Here, the defense was thwarted in its quest to review the records of Jill Smith, who had conducted the

---

[1] I acknowledge that these notations of Jill Smith were submitted to this court under seal. Nevertheless, in my judgment these parts of the Smith records should have been made available to Johnson's counsel for the reasons stated in my dissent.

more recent therapy sessions with Ashley and who, without question, would have had a better grasp of her current mental state.

The sole support cited by the majority for the State's unique position is a 1915 civil case in which the issue was the disclosure of privileged information at retrial. See *Maryland Casualty Co. v. Maloney*, 119 Ark. 434, 178 S.W. 387 (1915). In *Maloney*, which was a medical malpractice case, the plaintiff/widow did not object to the testimony of certain defense witnesses who were doctors and who testified about her husband's cause of death. The widow did assert the privilege at the second trial, and we upheld it. Apart from the fact that a civil case does not call into play the fundamental rights and policy considerations inherent in a capital murder trial, *Maloney* did not involve the State's waiver of the privilege to shore up grounds for Ashley's incompetence at the first trial, and then the invocation of the privilege at the second trial to prevent the damaging testimony of a second psychotherapist. The *Maloney* case is simply not controlling authority.

This court has upheld the waiver of a privilege in two recent cases. See *Dansby v. State*, 338 Ark. 697, 1 S.W.3d 403 (1999) (Dansby waived husband-wife privilege by communicating privileged matter to a third party); *Anthony v. State*, 332 Ark. 595, 967 S.W.2d 552 (1009) (defendant waived her privilege against self-incrimination by testifying on the matter at the first trial and her prior testimony was admissible at retrial even though the defendant invoked her right to silence at the second trial). Certainly, the *Anthony* rationale should extend the waiver to Ashley's second psychotherapist prior to retrial.

Nor can it be argued that any error in excluding Jill Smith's records was harmless error beyond a reasonable doubt. See *Chapman v. State of California*, 386 U.S. 18 (1967). Jill Smith did agree with Dr. Barnes that Ashley's stories were inconsistent, but her notations also support an entirely new basis for attacking Ashley's credibility. That basis is premised on bias and duress resulting from intense pressure brought to bear on her by family and the prosecutor to convict Johnson.

Some jurisdictions have weighed the confidentiality of the privileged information against the right to cross-examine the credibility of a State witness to decide which policy should yield, even when no waiver is involved. See, *e.g.*, *Schaefer v. State*, 695 So.2d 656

(Ala. Ct. Crim. App. 1996); *Bobo v. State*, 256 Ga. 357, 349 S.E.2d 690 (1986); *State v. McBride*, 213 N.J. Super. 255, 517 A.2d 152 (1986). In *McBride*, the New Jersey Superior Court held that the psychologist-patient privilege may be defeated when common notions of fairness clearly compel at least limited disclosure of otherwise confidential information. And in a case where waiver of the privilege was involved and used as a strategic tool, the Washington Court of Appeals had this to say:

> In adopting a rule for this jurisdiction we must weigh two varying public policies. On the one hand, the very reason behind the physician-patient relationship is to create an atmosphere of confidence. If the law were otherwise, many needing medical attention might go untreated for fear that what they told the doctor might not remain confidential. On the other hand, if a patient is allowed to pick and choose between physician witnesses and can, by claim of privilege, prevent impeaching testimony from being disclosed to the court, a mockery might be made of justice.

*State v. Tradewell*, 9 Wash. App. 821, 824, 515 P.2d 172, 174 (1973). That "picking and choosing" is exactly what occurred in the case before us.

Certainly the extent of any waiver of a privilege must be reviewed by this court on a case-by-case basis for an abuse of discretion. *See Schaefer v. State, supra; State v. Storlazzi*, 191 Conn. 453, 464 A.2d 829 (1983). But in this case, the waiver of the privilege for Dr. Barnes and then the assertion of it for Jill Smith seem largely a matter of trial strategy. Here, the trial court apparently conducted an *in camera* review of Smith's records for mitigating evidence. *See State v. McBride, supra.* But then the court ordered that Jill Smith's records be excluded in their entirety. That was an abuse of discretion in my opinion. Under these facts I can only conclude that Johnson was hamstrung in his cross-examination of Ashley and in his defense in general and, thus, was denied his right to a fair trial.

IMBER and THORNTON, JJ., join.