Cite as 2019 Ark. 391

# SUPREME COURT OF ARKANSAS
No. CR–18–700

| | |
|---|---|
| | **Opinion Delivered** December 12, 2019 |
| STACEY EUGENE JOHNSON<br>APPELLANT | APPEAL FROM THE SEVIER COUNTY CIRCUIT COURT [NO. 67CR–93–54] |
| V. | |
| STATE OF ARKANSAS<br>APPELLEE | HONORABLE CHARLES A. YEARGAN, JUDGE |
| | AFFIRMED. |

**SHAWN A. WOMACK, Associate Justice**

Stacey Johnson was twice convicted and sentenced to death for the 1993 murder of Carol Heath. Johnson has challenged his conviction on direct appeal, in state postconviction proceedings, and on federal habeas review. All of his challenges have ultimately proven unsuccessful. Now, Johnson seeks DNA testing of twenty-six pieces of evidence. He contends the results of the proposed testing could possibly exonerate him. The court is authorized to order testing only under certain specified conditions. *See* Ark. Code Ann. §§ 16–112–201 to –208 (Repl. 2016) ("Act 1780"). The circuit court concluded that Johnson failed to meet the predicate requirements for testing and denied his request. We affirm.

I.

A.

On the morning of April 2, 1993, Carol Heath was found dead on the living room floor of her DeQueen duplex. She was lying in a pool of blood, dressed only in a white

shirt that had been wadded up around her neck. Her throat had been sliced through one-quarter inch into her spine, completely severing her windpipe, strap muscles, and the major arteries and veins in her neck. But that was not the sole cause of her death. Heath had also been strangled and sustained blunt force head injuries. The defensive wounds scattered across her arms and legs suggested that she tried to resist her attacker. Bite marks were found on each breast. A small contusion was discovered near the vaginal area that was consistent with, but not conclusive of, sexual assault.

Heath's two children were also in the home that night: Ashley, six years old, and Jonathan, age two. They were in the bedroom when Heath's body was discovered by her sister-in-law, Rose Cassady. After police removed the children through the bedroom window, Ashley told Cassady that "a black man broke in last night."

A few hours later, Ashley was interviewed by Arkansas State Police Investigator Hayes McWhirter. She told McWhirter that a black male with a "girl sounding name" had come over that night. He wore a "black hat with something hanging down in the back," a green shirt, and a sweater. According to Ashley, the man told Heath he had just been released from jail and was mad at Heath for dating Branson Ramsey. She saw the man and her mother fighting. Ashley then saw Heath lying on the floor bleeding, while the man stood next to Heath with a knife in hand. After the interview, Ashley twice identified Johnson—an African American male—from a line-up of seven photographs.

Prior to Heath's murder, Johnson lived in Albuquerque, New Mexico. He came to DeQueen in January 1993 to attend his father's funeral. While in town, Johnson met Ramsey, who was dating Heath at the time. He followed Ramsey to a party at Heath's

apartment. According to Shawnda Flowers Helms, Heath's friend, Johnson asked both women if they would date him and transport drugs for him. They refused and told him they did not date black men. Soon thereafter, Johnson approached the women at Ramsey's social establishment. He again asked them to date him and transport drugs. They again refused. Helms testified that Johnson appeared angry each time they rejected him.

Johnson was soon arrested for being a felon in possession of a firearm. He was incarcerated in the Sevier County jail from February 1993 until April 1, 1993. Steve Hill, a fellow inmate, testified that Johnson talked about meeting Heath through Ramsey and his plans to see her when he was released. According to Hill, Johnson also stated that "when he got out, he was going to have sex with the first woman he ran into." The day before his release, Johnson spoke about Heath with another inmate, Bobby Ray Wilkinson. Johnson told Wilkinson that he had "fucked her a time or two." Wilkinson knew Heath and did not believe him. So, Wilkinson asked him to describe the inside of her apartment, which he did. Before Johnson was released the following afternoon, he told Wilkinson that "he was going to go see [Heath] and he was going to fuck her again when he got out."

On April 1, Johnson was released from jail at 2:00 p.m. He was the only African American male released from the Sevier County jail between March 14 and April 2 that year. After his release, Johnson went to his stepmother's home. She gave him a white t-shirt that had belonged to his father. When Johnson left that evening, he was wearing a black "do rag," a green shirt, and a jacket. He told her that he planned to stay the night with a white girl who had two young children.[1] Heath's body was found the next morning.

---

[1] Carol Heath is Caucasian.

Three days after Heath's murder, her purse was discovered by a local resident at a roadside park between DeQueen and Horatio. Police examined the area and found a green pullover shirt, a white t-shirt, and a towel. A partially smoked cigarette was found in the pocket of the green shirt. Johnson's stepmother later testified that the white shirt looked like the one she had given him on April 1. She also recognized the green shirt as the one Johnson wore when she last saw him that evening. Testing revealed that the blood on the shirts and towel was consistent with Heath's DNA. Saliva on the cigarette was consistent with Johnson's DNA, as were several African American hairs found on and around Heath's body. This scientific evidence connected Johnson to both crime scenes.

Johnson was arrested several days later in Albuquerque after providing false identification during a traffic stop. He offered the arresting officers $5,000 each to release him. At the station, Johnson gave his true identity and confessed to one officer that he killed someone in Arkansas and had a warrant out for his arrest. He was soon extradited to Arkansas and stood trial for capital murder.

B.

Johnson was first convicted of capital murder and sentenced to death in 1994. Because Ashley was found not competent to testify, the trial court allowed Officer McWhirter to read her prior statement and testify to her identification of Johnson. On appeal, we held that Ashley's identification was not admissible under the excited utterance exception to the hearsay rule. *See Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996) (*Johnson I*). We reversed and ordered a new trial.

Johnson was re-tried in 1997. This time, Ashley was competent to testify. New STR–DNA testing had also been conducted on the partially smoked cigarette, the green shirt, and the African American hairs. Under the new testing, the probability of the saliva on the cigarette belonging to anyone other than Johnson decreased to one in 28 million African Americans. *See Johnson v. State*, 356 Ark. 534, 543, 157 S.W.3d 151, 159 (2004) (*Johnson III*). The testing also showed that the African American hairs found on and around Heath's body were consistent with Johnson's DNA and would occur in one of 720 million African Americans. *See Johnson v. State*, 366 Ark. 390, 392, 235 S.W.3d 872, 873 (2006) (*Johnson IV*). The probability that the blood on the green shirt belonged to Heath was similarly bolstered. *Id.*

Nevertheless, Johnson maintained his innocence. He alleged that another person, namely Ramsey, murdered Heath. But the jury was not convinced. Johnson was once again convicted of Heath's murder and sentenced to death. The conviction was affirmed on direct appeal. *See Johnson v. State*, 342 Ark. 186, 27 S.W.3d 405 (2000) (*Johnson II*).

Johnson unsuccessfully sought postconviction relief under Rule 37. *See Johnson III*, 356 Ark. 534, 157 S.W.3d 151. He also moved for DNA testing under Act 1780. Johnson sought testing of a number of Caucasian hairs, retesting of the partially smoked cigarette, and retesting of some African American hairs. We ordered retesting only on the latter. *Id.* That decision was made under the mistaken belief that the hairs had not been tested since the 1994 trial. *See Johnson IV*, 366 Ark. at 394, 235 S.W.3d at 874–75. On remand, the circuit court held that new testing had been performed prior to the 1997 trial. *Id.* As mentioned above, the hairs were consistent with Johnson's DNA in a pattern that would

5

occur in one of 720 million African Americans. *Id*. We affirmed the court's refusal to conduct further testing. *Id*. Johnson's pursuit of federal habeas relief was equally unavailing. *See Johnson v. Norris*, 537 F.3d 840 (8th Cir. 2008), *cert. denied*, 555 U.S. 1182 (2009).

The State of Arkansas subsequently scheduled Johnson's execution for April 20, 2017. Three weeks before his execution date, Johnson sought a recall of our mandate or, alternatively, permission to seek error coram nobis relief. He also requested a stay of execution. In his petition, Johnson again sought testing of the Caucasian hairs. He alleged the testing would show that Ramsey, who died in 1998, was responsible for Heath's death. We denied his petition.

Days later, Johnson filed the underlying petition for postconviction DNA testing in the circuit court. He claimed the proposed testing might reveal DNA belonging to Ramsey or some other identified man, which could undermine the prosecution's case or exonerate him. He sought testing of twenty-six pieces of evidence. The evidence can be broadly categorized into three groups: (1) evidence of an alleged sexual assault;[2] (2) evidence from the roadside park;[3] and (3) evidence on and around Heath's body.[4] The court denied his request, concluding that he failed to meet the predicate requirements under Act 1780. We

---

[2]The alleged sexual assault evidence includes: the rape kit; pubic hair; a douche bottle and condom box found in the bathroom; and swabs taken from liquid found under Heath's body.

[3]The roadside park evidence includes: the white and green shirts; a towel; Caucasian hairs found on both shirts and the towel; and Heath's purse and its contents.

[4]This includes: breast swabs; Heath's nail clippings; bags used to cover Heath's hands while transporting her body; a pair of underwear found near Heath's body; a towel found in the house and a Caucasian hair on the towel; Heath's white shirt and a Caucasian hair found on it; a washcloth; and tissue paper found near Heath's body.

stayed the execution and remanded the case for an evidentiary hearing on the motion for postconviction DNA testing. *See Johnson v. State*, 2017 Ark. 138 (*Johnson V*).

At the hearing, Johnson offered evidence on three testing methodologies: touch DNA, mitochondrial DNA, and Y-STR DNA. He also proffered the testimony of Dr. Margaret Kovera, an alleged eyewitness identification expert, regarding the reliability of eyewitness identifications. The circuit court again found that Johnson had not satisfied the requirements for testing under Act 1780. The court also declined to consider Dr. Kovera's testimony. It is from this ruling that Johnson now appeals.

II.

Johnson submits three issues for our review. He first contends that the circuit court erroneously held that he failed to meet the predicate requirements for scientific testing under Act 1780. Johnson also challenges the circuit court's conclusion that the proposed testing would not produce new material evidence sufficient to raise a reasonable probability of his actual innocence. Given that we must necessarily consider the second issue in our analysis of the first, we will examine the issues together. Johnson's final point on appeal asks whether the circuit court abused its discretion by refusing to admit Dr. Kovera's testimony. For reasons explained below, we decline to consider this argument.

Our review today is limited to whether Johnson satisfied the predicate conditions for scientific testing under Act 1780. We will not reverse a denial of postconviction DNA testing under Act 1780 unless the circuit court's findings are clearly erroneous. *See McClinton v. State*, 2017 Ark. 360, at 3–4, 533 S.W.3d 578, 580. A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire

evidence is left with the definite and firm conviction that a mistake has been committed. *Id.* With this in mind, we proceed to the merits of this appeal.

A.

There is no question that the "advent of DNA technology is one of the most significant scientific advancements of our era." *Maryland v. King*, 569 U.S. 435, 442 (2013). Recognizing the potential of this technology, the Arkansas General Assembly adopted Act 1780 of 2001, as amended by Act 2250 of 2005, to provide a remedy for innocent persons who may be exonerated by new scientific evidence. *See* Act of Apr. 19, 2001, No. 1780, 2001 Ark. Acts 7737. Act 1780 provides that a writ of habeas corpus can issue based on new scientific evidence proving the actual innocence of a wrongfully convicted person. *See* Ark. Code Ann. § 16-112-201(a)(1).

At the same time, the statutory scheme was "not meant to do away with finality in judgments." *Johnson III*, 356 Ark. at 549, 157 S.W.3d at 163. As the United States Supreme Court has explained, "[w]here there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent. The availability of technologies not available at trial cannot mean that every criminal conviction, or even every criminal conviction involving biological evidence, is suddenly in doubt." *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 62 (2009) (internal citation omitted). To that end, postconviction testing is authorized only under specified conditions. *See* Ark. Code Ann. §§ 16-112-201 to -203. The petitioner bears the burden of establishing that each condition is satisfied. *See McClinton*, 2017 Ark. 360, at 5, 533 S.W.3d

8

at 581. Failure to meet any one condition precludes scientific testing as a matter of law. *See Hall v. State*, 2017 Ark. 77, at 3, 511 S.W.3d 842, 843 (per curiam).

Act 1780 preconditions the availability of DNA testing on, among other things, the petitioner's identification of a theory of defense that would establish his actual innocence. *See* Ark. Code Ann. § 16-112-202(6)(B). The petitioner must also show that the proposed testing may produce new material evidence that would support his theory and raise a reasonable probability that he did not commit the offense. *See* Ark. Code Ann. § 16-112-202(8). In other words, Act 1780 does not permit testing of evidence based on a mere assertion of innocence or a theoretical possibility that additional testing might alter the outcome of a trial. *See Martin v. State*, 2018 Ark. 176, at 3, 545 S.W.3d 763, 765. We have consequently held that testing is authorized only if it can provide materially relevant evidence that will significantly advance the petitioner's claim of innocence in light of all evidence presented to the jury. *See McClinton*, 2017 Ark. 360, at 5, 533 S.W.3d at 581.

Johnson claims that another man, possibly Branson Ramsey, murdered Carol Heath. Should the proposed testing reveal DNA belonging to Ramsey or another male, Johnson claims it would cast substantial doubt on the prosecution's theory and raise a reasonable probability of his actual innocence. The circuit court disagreed. It noted that the proposed testing "may produce evidence that would support a theoretical defense, as it would in almost every case." Yet, the court determined the testing would not produce evidence that would raise a reasonable probability of Johnson's innocence or a third-party's guilt. It found that Johnson's defense was "based solely upon his own assertion of innocence and his attack upon the credibility of Ashley Heath[.]" Finding the scientific and testimonial evidence

9

presented at trial "overwhelmingly pointed" to Johnson's guilt, the court concluded that Johnson failed to satisfy section 16–112–202(8).

We cannot say that these findings were clearly erroneous. We agree with the circuit court that the proposed testing could not raise a reasonable probability that Johnson did not commit the offense. As other courts have done in finding that a petitioner failed to satisfy an identical "reasonable probability" requirement, we note the significant evidence tying Johnson to the murder.[5] *See United States v. Jordan*, 594 F.3d 1265, 1268 (10th Cir. 2010); *United States v. Pitera*, 675 F.3d 122, 129 (2d Cir. 2012); *United States v. Cowley*, 814 F.3d 691, 700 (4th Cir. 2016). This is not the same as considering the sufficiency of the evidence on direct appeal. Indeed, the "reasonable probability" requirement may be met when favorable testing results would cause a "strong case" against the petitioner to "evaporate." *United States v. Fasano*, 577 F.3d 572, 578 (5th Cir. 2009). But where, like here, the "presence or absence of the [petitioner's] DNA would not show actual innocence, there is no reason to test for it." *United States v. Watson*, 792 F.3d 1174, 1180 (9th Cir. 2015).

The dissent suggests that we reevaluate and reweigh the credibility of evidence presented at trial. This approach is flatly inconsistent with the statutory requirements in Act 1780 and dismisses the role of this court on appellate review. The proposed analysis would require substituting our judgment for the jury, which is simply not our role. *See, e.g., Smoak v. State*, 2011 Ark. 529, at 6, 385 S.W.3d 257, 261. The dissent would effectively relieve

---

[5]In 2005, the legislature amended Act 1780 so that the provisions are substantially identical to the federal Justice for All Act of 2004, codified at 18 U.S.C. § 3600. The conditions within Ark. Code Ann. § 16–112–202(6) and (8) are identical to those at 18 U.S.C. §§ 3600(a)(6) and 3600(a)(8).

Johnson of the burden to satisfy the conditions for testing under Act 1780. Conversely, the State would be placed in the untenable position of overcoming a presumption in favor of testing. The State would also be required to defend the evidence at trial against the court's speculative credibility assessments made in place of the jury. We reject this approach.

Turning now to our analysis, we fail to see how the presence of another male's DNA on the evidence would raise a reasonable probability of Johnson's innocence. We have previously determined that the Caucasian hairs were not materially relevant to Johnson's claim of actual innocence. *See Johnson III*, 356 Ark. at 548, 157 S.W.3d at 162. As we explained in *Johnson III*, the prosecution stipulated that Johnson was not the donor of the Caucasian hairs. *Id*. The jury was, therefore, aware that hairs belonging to someone other than Johnson had been found. Yet the jury still convicted him. *Id*. This analysis remains true and is applicable to other evidence. Just as the jury heard about the Caucasian hairs, it heard Johnson's theory that Ramsey murdered Heath. And it heard that Johnson was excluded from the DNA found on the breast swabs and on the white shirt from the roadside park.[6] Even so, the jury still convicted Johnson.

Even assuming the proposed testing revealed DNA belonging to Ramsey, there is a logical explanation for its presence on much of the evidence. Many of the twenty-six pieces of evidence that Johnson wants tested would have been in Heath's home at some point prior to the crime. Record evidence established that Ramsey had seen Heath the day before she was murdered and visited her home multiple times in the months before her death. It is

---

[6]In 1997, Johnson's consulting DNA expert noted that DNA from the breast swab and the white shirt had "additional alleles too weak to interpret with confidence, but consistent with alleles present in S. Johnson." The jury was unaware of this finding.

11

undisputed that Ramsey had engaged in a romantic relationship with Heath. Indeed, Shawnda Flowers Helms testified that Ramsey and Heath were dating at the time of the murder. There would accordingly be an innocent explanation for Ramsey's DNA on much of the evidence found on and around Heath's body and in her home.

At any rate, the presence of another male's DNA could not significantly advance Johnson's claim of innocence in light of the remaining evidence. It simply cannot explain away the DNA evidence directly linking Johnson to both crime scenes: Johnson's saliva on the partially smoked cigarette in the pocket of the bloody green shirt at the roadside park and his hairs discovered on and around Heath's body. Nor can it change that Ashley twice identified him as the black man with a "girl sounding name" who stood over her bleeding mother, knife in hand. It would likewise not alter his confession to New Mexico police, his stepmother's testimony, or his jailhouse bragging about Heath and his plans to see her when he was released.

What is more, any results from the proposed testing cannot erase the consistencies connecting multiple pieces of evidence that point to Johnson's guilt. For example, Ashley stated that the black man wore a "black hat with something hanging down in the back," a green shirt, and a sweater. Johnson's stepmother testified that on the evening of April 1, 1993, he wore a black "do rag," a green shirt, and a jacket. She recognized that green shirt as the one found at the roadside park stained with Heath's blood. The partially smoked cigarette with Johnson's DNA was found in the pocket of that shirt. The green shirt was found next to a white shirt, also covered in Heath's blood, that Johnson's stepmother recognized as one she had given him when he was released from jail. Additionally, Ashley

12

stated that the man told Heath he had just been released from jail. Johnson was the only African American male released from the Sevier County jail from March 14, 1993, until after Heath's body was found. Moreover, his stepmother testified that Johnson planned to stay that night with a white girl with two young children. This description fits Heath. It is also consistent with fellow inmates' testimony that Johnson planned to see Heath when he was released from jail. Heath was found brutally murdered the next morning.

Finally, we must respond to the dissent's unwarranted suggestion that the denial of testing reflects racial bias by the State of Arkansas and a majority of this court. Race has nothing to do with the legal question in this case, which is whether Johnson satisfied the predicate requirements for testing under Act 1780. We likewise object to the dissent's assertion that law enforcement officers "manufactured" the chain of custody and "swapp[ed] in" critical evidence. Such undeserved and unsubstantiated attacks undermine the public's trust in the integrity of our criminal justice system.

In sum, none of the evidence that might result from the proposed testing could advance Johnson's claim of actual innocence or raise a reasonable probability that he did not murder Carol Heath. Because the presence or absence of Johnson's or another male's DNA would not show actual innocence, there is no reason to test for it. We need not consider the remaining claims given Johnson's failure to make this predicate showing. The circuit court's decision denying Johnson's request for postconviction DNA testing is affirmed.

B.

Petitions under Act 1780 are limited to claims related to scientific testing of evidence. *See McClinton*, 2017 Ark. 360, at 4, 533 S.W.3d at 581. A petitioner cannot bootstrap claims

13

falling outside the purview of Act 1780, even for the purpose of justifying entitlement to scientific testing. *Id*. This was precisely what Johnson sought to do by offering Dr. Kovera's testimony about the reliability of eyewitness identification. Further, our mandate explicitly remanded the petition to the circuit court "for a hearing on petitioner's motion for postconviction DNA testing." *Johnson V*, 2017 Ark. 138. Anything more would have exceeded the scope of our mandate. *See Lacy v. State*, 2018 Ark. 174, at 6, 545 S.W.3d 746, 750. We accordingly decline to consider any argument on this matter.

Affirmed.

BAKER, J., concurs.

HART and WYNNE, JJ., dissent.

**KAREN R. BAKER, Justice, concurring**. Because Johnson has failed to demonstrate that the circuit court erred, I concur with the majority opinion.

"This court does not reverse a denial of postconviction relief unless the circuit court's findings are clearly erroneous. *Polivka v. State*, 2010 Ark. 152, 362 S.W.3d 918. A finding is clearly erroneous when, although there is evidence to support it, the appellate court after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed. *State v. Barrett*, 371 Ark. 91, 95, 263 S.W.3d 542, 545 (2007)." *Sandrelli v. State*, 2016 Ark. 103, at 2, 485 S.W.3d 692, 694. This same standard of review applies when a circuit court denies DNA testing under Arkansas Code Annotated sections 16–112–201 to –208. *Carter v. State*, 2015 Ark. 57, 536 S.W.3d 123.

Here, the record before us and the applicable standard of review support our holding that Johnson has failed to demonstrate that the circuit court's decision was clearly erroneous. Accordingly, I would affirm the circuit court.

**JOSEPHINE LINKER HART, Justice, dissenting**. The majority aims to blunt the unsettling circumstances identified herein, generalizing that this dissent levies "unwarranted suggestion[s]," "undeserved and unsubstantiated attacks," etc. While I am disappointed by the majority's response, I note that the majority does not attempt to demonstrate the alleged falsity or illegitimacy of even a single factual representation contained in this opinion. Instead of relying on hyperbole and a hand wave, this opinion supports its conclusions by simply citing to the record. The record can speak for itself.

I. *Introduction*

This is a postconviction request for scientific testing in a death-penalty case. At this point in time, Stacey Johnson is not asking to be released from prison. Presently, he is not even asking for a new trial. All he is asking for is modern scientific *testing* on the evidence used to convict him for the 1993 murder of Carol Heath. Act 1780, now codified at Ark. Code Ann. §§ 16-112-201 to –208, provides for such testing, and Johnson's is a case in which additional testing is not only appropriate, but necessary. However, the majority denies Johnson's request, concluding that he fails to satisfy the prerequisites for testing prescribed in Ark. Code Ann. section 16-112-202.

But the majority is only able to support its conclusion by contending that the case against Johnson was simply insurmountable, and any proposed testing, therefore, would not make any difference. The majority has essentially treated this matter as if it were a

15

sufficiency-of-the-evidence appeal directly from a conviction, in which the appellate court considers *only* the evidence that supports the guilty verdict and reviews that evidence in the light *most favorable* to the prosecution. *See, e.g.*, *Hale v. State*, 343 Ark. 62, 74, 31 S.W.3d 850, 857 (2000). Such is not the matter currently before this court.

The two specific prerequisites for testing at issue here are found in Arkansas Code Annotated section 16-112-202(6) and (8). Section 16-112-202(6) requires the petition for scientific testing to "*identif[y] a theory of defense* that . . . [w]ould establish the actual innocence of the person in relation to the offense being challenged[.]" (Emphasis added.) Section 16-112-202(8) requires the petition to show that

> [t]he proposed testing of the specific evidence *may* produce new material evidence that would . . . [s]*upport* the theory of defense described in subdivision (6) (and) . . . [r]aise a *reasonable probability* that the person . . . did not commit the offense[.]

(Emphasis added.) Read together, subdivision (6) requires Johnson to "identify" a theory of actual innocence, and subdivision (8) requires Johnson to show how the testing "may" produce new evidence that would "support" that theory and show a "reasonable probability" that he did not kill Carol Heath.

There can be no legitimate answer to these questions without an objective assessment of the relevant evidentiary circumstances of Johnson's case, including the reliability of the evidence used to convict him. There is no other way this court could determine whether the proposed testing may show a "reasonable probability" of Johnson's innocence. Instead, the majority selectively quotes from disputed testimony by State witnesses and altogether ignores glaring issues related to the investigation and prosecution of this crime, ultimately concluding that Johnson fails to satisfy subdivisions (6) and (8). But as set forth below, in

this particular case, there is reason to question the reliability of much of the evidence and testimony used against Johnson. Additionally, there are numerous highly probative evidentiary items that inexplicably have never been subjected to scientific testing, but obviously need to be. Our inquiry necessarily must account for such circumstances.

Accordingly, the majority opinion's explanation of the evidence and the investigation of this crime will need to be supplemented at various points in this opinion. Even if a citizen is under a death sentence, the least he deserves is a complete and objective characterization of his case. Both sides of the issues must be acknowledged. The finality of the penalty Johnson is set to receive cannot be understated, and as Justice Wynne observed at oral argument in this case, "we have to get this right." A fair analysis shows that the requirements for postconviction scientific testing have been satisfied.

## II. *Ark. Code Ann. § 16-112-202(6)–Theory of Innocence*

There should be no dispute that Johnson has adequately "identified" a "theory" of innocence, satisfying section 16–112-202(6). Johnson's theory is as follows: while he and Carol Heath had engaged in consensual sexual acts both before and on the night of the murder, he did not kill her; instead, Johnson left Heath's apartment to return to New Mexico that evening (without having killed Heath or anyone else), and someone else committed the murder.

It should be noted that this is not some novel claim Johnson conjured up at the last minute to delay his death sentence. After Johnson was arrested for Heath's murder, he was interviewed by a clinical psychologist on March 8, 1994, to confirm he was competent to stand trial. The psychologist's report from that interview is included in the record. The

"version of alleged offense" that was elicited from Johnson and included in the psychologist's report (over twenty-five years ago) is as follows:

> Mr. Johnson was asked about the alleged offense and he denied killing anyone. He said some little girl picked his picture but "I haven't killed no one." He said he met the victim Carol Heath in January. He claims he and his friends took cocaine to her and they all snorted the drug. He said she "gave us head." He said shortly after he met Ms. Heath he was arrested for possession of a firearm. He was in the DeQueen County jail until he said he was released on April 1, 1993. He said when he was released from jail he intended to leave for New Mexico that day. He said before he left he wanted to "party and we were kicking it." He said he saw Ms. Heath at a party doing drugs. He said he left with her and another couple to go to her house. Once at Mrs. Heath's house the other couple was in another room. He said he was having sexual foreplay with Ms. Heath. He said a man knocked on the door asking the victim for "his stuff." He said he had an altercation with the man and they exchanged words. He left Ms. Heath's house and this individual stayed there. He claims he left at that time and drove to New Mexico. He said after a week in New Mexico "a chick I know told me I had a warrant out for murder." He said he was loaded on drugs at the time but was arrested in New Mexico. He would not sign for extradition and in late 1993 he was finally transferred to DeQueen, Arkansas.

Section 16-112-202(6) requires only that Johnson "identify" a theory of innocence. While the theory stated above is sufficient to satisfy this basic requirement, some of the factual circumstances that would support this theory can be more seamlessly relayed here. There are additional circumstances (also not addressed in the majority opinion) that will need to be supplemented in the section 16-112-202(8) analysis.

First, much of the evidence in this case points to a white perpetrator. It is important to note that an "inch-and-a-half red beard hair" was found in the victim's hand at the first crime scene. The majority heavily relies on the proposition that hairs recovered at the first crime scene (one from just under the victim's left breast, two from the floor near her body, and one from a bedsheet inside her apartment) have since been matched to Johnson's genetic

profile through older forms of scientific testing. However, Johnson, a black man with dark hair, obviously did not shed the red beard hair. In fact, there were *numerous* Caucasian hairs, dissimilar to the those of the victim, found at *both* the first crime scene (Heath's apartment) and the second crime scene (a wooded area where Heath's purse and several other items were found), which was discovered a few days later.

For example, a Caucasian hair, dissimilar to those of the victim, was recovered from the blood-soaked towel found on the floor by the victim's head. Another was recovered from the toilet paper found on the floor beneath the victim's genital area. Another was found on the floor beneath the victim's body. Three such hair fragments were recovered from a washcloth found in a paper sack inside the bathroom at Heath's apartment, which was "possibly used by suspect" to wipe down the crime scene, according to the investigator who collected that evidence. Two such hairs were recovered from the green shirt found at the second crime scene. Another was recovered from the white T-shirt found at the second crime scene. Another was recovered from the towel found at the second crime scene.

Unlike Johnson's hairs, which are of (what the forensic specialists referred to as) "Negroid origin" and have since been matched to his genetic profile through scientific testing, *none of the Caucasian hairs identified in the paragraphs above* have ever been subjected to scientific testing, despite Johnson's continued requests. The fact that the Caucasian hairs have never been tested is glaring and significant. Particularly so, since Brandon Ramsey, a white male who either was dating the victim at the time of her murder or was recently her ex-boyfriend, is described as having had a "reddish brown beard" at the time of the murder.

There was testimony at Johnson's postconviction Rule 37 hearing that Ramsey had been going through a divorce and had just lost custody of his children at a temporary hearing on the day of Heath's murder. The day Carol Heath's body was discovered, Ramsey was interviewed by the DeQueen police. During the interview, Ramsey acknowledged that he had seen Heath as recently as the day before she was murdered. However, the record does not reveal any effort to match Ramsey to the aforementioned red beard hair found in the victim's hand (or any of the other hairs), or that any investigative steps were taken to develop Ramsey as a suspect. During the interview, Ramsey also stated, "I had Stacey Johnson arrested recently carrying a weapon. That's what he has been in jail for. He got out of jail recently. I am afraid of him."

Also relevant here is that the victim was found with bite marks on her breasts. At trial, Johnson sought to call Cordelia Vinyard, Ramsey's ex-wife, to testify as a witness in his defense, but the trial court refused to allow her testimony. However, outside the presence of the jury, Johnson proffered Vinyard's testimony for the record. In her proffered testimony, Vinyard stated that she divorced Ramsey because he had physically abused her, and she testified specifically that he would bite her on her breasts.

Overall, the evidence pointing to a white perpetrator supports Johnson's claim that someone else killed Carol Heath. Johnson has "identif[ied]" a theory of innocence, and section 16-112-202(6) is satisfied.

### III. *Ark. Code Ann. § 16-112-202(8)–Reasonable Probability*

Section 16-112-202(8) requires Johnson to show how the proposed testing "may" produce new evidence that would "support" his theory of innocence and show a

20

"reasonable probability" that he did not kill Carol Heath. The majority concludes that Johnson could never satisfy this prerequisite, since "any results from the proposed testing cannot erase the consistencies connecting multiple pieces of evidence that point to Johnson's guilt." (Maj. Op. at 12). In particular, the majority points to (1) what it characterizes as Johnson's "confession"; (2) the testimony of Johnson's stepmother, Sharon Johnson, regarding the green shirt and the white T-shirt reportedly found at the second crime scene; (3) the testimony of the victim's daughter, Ashley Heath; and (4) a "cigarette butt" with traces of Johnson's saliva reportedly found in the pocket of the green shirt from the second crime scene. Before it can be determined whether Johnson has satisfied the criteria in section 16-112-202(8), the majority's characterization of this evidence must be supplemented.

A. Johnson's "Confession"

The majority contends that Johnson "confess(ed)" to this crime, but a review of the actual statements at issue does not support this contention. First, the majority alludes to statements Johnson made to fellow inmates and to his stepmother about planning to be with Carol Heath on the day she was murdered. But the actual testimony from those individuals provides only that Johnson had an existing sexual relationship with Ms. Heath and that he intended to see her on the night of the murder. Johnson readily admits those facts.

The only evidence in the record concerning any alleged "confession" was Albuquerque police officer Pacheco's testimony claiming Johnson told him "he had killed someone in Arkansas." However, there is substantial reason to doubt this characterization.

First, there is no written memorialization of any alleged confession by Johnson. While I have not reviewed the Albuquerque Police Department's training manual, I imagine

21

it instructs officers that if a suspect confesses to murder, someone should probably write that down and report it to superiors. The absence of any written memorialization of Johnson's alleged confession undercuts the reliability of Pacheco's testimony on this point. Additionally, Pacheco's testimony was contradicted by his own partner, Officer Bylotas, who said he did not hear Johnson make any confession.

After Johnson was arrested by the Albuquerque police officers, he was interviewed by Detective Foley. The transcript from that interview is in the record, and it contains nothing even remotely resembling a "confession" to Heath's murder (whether made to Officer Pacheco or to anyone else), nor any reference to Johnson offering his arresting officers money to let him go, nor any allusion thereto. The transcript does show that Johnson maintained he had never killed anyone.

Finally, the offense report that the Albuquerque Police Department sent to the DeQueen Police Department is particularly illuminating. This report details and summarizes the circumstances of Johnson's arrest, his interview, and the subsequent investigative steps taken by the Albuquerque officers. It specifically notes Officer Pacheco's involvement in Johnson's arrest, yet it makes no reference whatsoever to a confession by Johnson, nor to Officer Pacheco reporting any such confession, nor to Johnson offering his arresting officers money to let him go.

In short, what the majority characterizes as Johnson's "confession" (without any further explanation) is not borne out in the record. It certainly is not a sufficient reason to bar Johnson's request for scientific testing.

B. Sharon Johnson's Deposition Testimony

The majority intimates that Johnson's stepmother, Sharon Johnson, concluded that the green shirt and the white T-shirt found at the second crime scene were the same shirts that Johnson had left her house with on the day of the murder. This intimation significantly overstates and mischaracterizes Sharon's testimony; she could not confirm that either shirt was a match. In fact, the transcript from her testimony reveals several details that bolster Johnson's request for new scientific testing on both shirts. These details will also be relevant to circumstances of the investigation addressed later in this opinion.

Sharon passed away before Johnson's first trial, but the prosecuting attorney and Johnson's trial counsel took her deposition before she died, and the transcript of that deposition was read into the record. On direct examination, the prosecutor showed Sharon the green shirt and the white T-shirt in evidence bags. In response to the prosecutor's questions, Sharon initially thought that the white T-shirt shown to her was the same one that belonged to Johnson's deceased father that she had given to Johnson on the day of the murder. She also initially thought that the green shirt shown to her was the same one Johnson put on at her house (the green shirt she saw Johnson wearing was one of his own, not his father's) on the day of the murder.

However, on cross-examination, Johnson's trial counsel actually took the shirts out of the evidence bags and showed them to Sharon. After examining both of the shirts, Sharon realized that she had to change her testimony. While Sharon was unable to confirm that these shirts were definitively *not* the same shirts that Johnson had left her house with on the day of the murder, she could not confirm that they *were*, either.

23

The white T-shirt from the evidence bag was a size large. Regarding the size of the shirt, Sharon testified as follows:

Q: Now, this shirt is a Hane's shirt. I can tell from the label in the shirt. You can see that or do you agree with me?

A: Yeah.

Q: And this is a size large. Now, are you telling us, Sharon, that there could not be any other Hanes T-shirts in DeQueen?

A: No. . . . No, I'm not saying that. . . . Because I know there's a whole bunch of them at Wal–Mart.

. . . .

Q: Okay. Now, Stacey is a large person. Would you agree with me there?

A: Yes.

Q: And probably to really fit him, he would need probably an extra large or a two X, would he not?

A: I don't know because he fits into all of his dad's clothes and I buy all of his dad's clothes extra – sometimes extra extra large and sometimes just extra large, depending on how they make them.

Q: Okay. So most of your husband's shirts were extra large or two extra large?

A: Right.

Q: So if this shirt is a large, would that lead you to tend to believe also that this was not your husband's shirt?

A: Yeah.

Sharon did go on to acknowledge the possibility that Johnson's dad had some size large T-shirts, since he had been diabetic, and his weight fluctuated from time to time. However, she nonetheless maintained that she could not confirm that the white T-shirt then being shown to her was the same one she gave to Johnson, which she also specified had been a

24

"v-neck." Later, DNA testing performed on the white T-shirt taken from the second crime scene would <u>exclude</u> Johnson as a contributor to the genetic profile obtained therefrom.

Sharon could not identify the green shirt, either. After the green shirt was removed from the evidence bag and Sharon looked it over, she testified as follows:

Q: Now, this shirt is the turquoise shirt that you've looked at, Sharon. Now, when Officer Godwin held it up for you a while ago, you mentioned that the shirt Stacey had on had pockets in the front?

A: Yeah, it had pockets in it.

Q: Okay. And you're pretty sure about that?

A: Yeah, I'm pretty sure about that.

Q: Now, you can agree and you see here this shirt doesn't have any pockets?

A: Yeah, it doesn't have no pockets.

Q: So basically all you can say is that when he left the last time about quarter till 9:00 that he had a turquoise shirt on because you can't say this is the same shirt, can you?

A: No, because the one he had on had pockets in it.

Q: Okay. What about the sleeves, Sharon? Do you remember what that shirt looked like that Stacey had on?

A: That looked like it.

Q: Now, there's a band here and a band here. I don't know whether you remember that or not.

A: That really looked like the shirt, though, that he had on that he left in.

Q: Okay. Except that you would say that it is not the shirt because of the pocket?

A: Right.

25

There are additional issues concerning the green shirt (Sharon described the color of the shirt Johnson put on at her house as "turquoise") and its pockets, or lack thereof, that should be addressed here. While the prosecutor at Johnson's trial stated that the green shirt had a "slit" pocket (which is where the cigarette butt was allegedly found—more on that later), the two pictures of the green shirt in the record on appeal do not clearly show that it has any pockets at all ("slit" or otherwise). If there was a "slit" pocket on the green shirt, Sharon plainly did not consider it to be the same type of "pockets" (plural) that were "on the front" of the turquoise shirt she saw Johnson wearing on the date of the murder.

Additionally, in a police interview with Deborah Ann Johnson, Johnson's aunt who also saw him on the date of the murder, Deborah stated, "He had on a light blue shirt, like a college sweatshirt but it had a hood and blue jeans." Neither of the shirts reportedly collected from the second crime scene have a hood.

It should also be noted here that Sharon's deposition was not the first time the authorities spoke with her in regard to Carol Heath's murder. Carol Heath's body was found the morning after Johnson had left Sharon's house. The police came to question Sharon about Johnson later that very same morning. (R. 1202, 1998 Direct Appeal.) The significance of this circumstance will be underscored in later sections of this opinion.

Ultimately, Sharon concluded her testimony by telling both Johnson's attorney and the prosecutor that while it was possible the shirts could be the same ones she saw Johnson with the day before the murder, she could not be sure either way. In the final exchange with Johnson's attorney, Sharon testified:

> Q: Okay. And, of course, [the prosecutor] asked you a lot of questions about these shirts, too, because they are important. You told [the prosecutor] that

you can't say that they are not the shirts. They look like them, but at the same time you can't positively identify them either, can you, Sharon?

A: No. I know that. All I know is he came in here with the turquoise shirt on.

Q: Okay. These shirts you've looked at are similar, but there are also some differences you told us about?

A: True.

And in the final exchange with the prosecutor, Sharon testified:

Q: Just one more, [Sharon]. These shirts can be the same ones that he had on; is that correct?

A: They could be.

Q: Okay.

Overall, Sharon's conclusions about the shirts were entirely equivocal. They certainly are not so overwhelming as to bar Johnson's petition for scientific testing.

## C. Ashley Heath's Testimony

The majority emphasizes that the victim's daughter, Ashley Heath, identified Johnson as the murderer. At trial, Rose Cassady, Carol Heath's sister-in-law, testified that when she first made contact with Ashley through the window of Heath's apartment, Ashley told her, "A black man broke in last night." During Ashley's testimony, she never stated that she saw Johnson kill Heath. However, in response to questions from the prosecutor, Ashley did state that Johnson had come by the apartment earlier that day; that she woke up in the middle of the night; that she left her room to get a drink of water; that she saw "mom and him were pushing each other"; that she went back to her mother's room and put her younger brother in the closet; that she then came back out and saw Johnson "on top of

27

(Heath)"; that she then went back into the closet; and that later when she came back out, Heath was "in the living room with blood all over her." She also testified that Johnson is the person whose picture she had picked out of a photo lineup during an interview with Officer McWhirter.

At the hearing on Johnson's petition for postconviction scientific testing in the circuit court below, Johnson sought to introduce testimony from Dr. Margaret Kovera, an eyewitness-identification expert. The circuit court refused to allow Dr. Kovera's testimony into evidence, but Johnson's postconviction counsel proffered it for the record. The circuit court's exclusion of Dr. Kovera's testimony was error,[1] and her testimony should be considered.

To generally summarize Dr. Kovera's testimony, she explained that the human-memory process works in three general phases: (1) acquisition or encoding, (2) storage, and (3) retrieval. "At each of those stages," she testified, "errors can be introduced, given certain circumstances." This would include "estimator variables" (factors that affect the witness's ability to correctly make and store a memory of the event, including cross-racial identification, witness age, stress, etc.) and "system variables" (factors that affect how memory is retrieved, including police-identification procedures and post-identification

---

[1]This testimony would have been highly relevant in this postconviction context, especially considering the circumstances surrounding Ashley Heath's testimony addressed in this section. Moreover, the provision of this subchapter prescribing hearing procedures contains no such limitation on expert opinion testimony as described in the majority opinion. *See* Ark. Code Ann. § 16-112-205(c)(4)–(5) ("Unless otherwise ordered by the court, the petitioner shall bear the burden of proving the facts alleged in the petition by a preponderance of the evidence. (. . .) The court may receive evidence in the form of affidavit, deposition, or oral testimony.").

28

information). Dr. Kovera explained that these circumstances can influence what someone ultimately testifies to, regardless of what that person did or did not actually witness. Obviously, this does not mean that any and all eyewitness testimony is therefore unreliable; it simply means that such circumstances, when introduced, can have an influence.

In this case, there are several reasons to suspect that Ashley Heath's testimony at trial may have been influenced by such circumstances.

First, it should be noted that by the time Ashley was interviewed by Officer McWhirter, the police had already questioned Sharon Johnson, Johnson's stepmother, earlier that morning. Between the information obtained from Sharon and from the questioning of others, the police would have already known Johnson's name, size (Johnson is six feet six inches tall, and was described as "chunky"), a description of the clothing he was wearing when he left his stepmother's house, a description of his hair, and the fact that he had been recently released from jail. Additionally, it is undisputed that Ashley had seen Johnson at Heath's apartment on prior occasions. It should also be noted that of the seven photos shown to Ashley, Johnson's was the only one featuring a person with baldness or a receding hairline. Furthermore, Ashley's interview with Officer McWhirter (which was unrecorded) was conducted the same day her mother's body was found. Ashley, who had just turned six years old, was with several family members at her grandmother's house during the hours leading up to the interview.

Whether Ashley's family members and the authorities pressured Ashley to identify Johnson is highly relevant to the reliability of her testimony. Before Johnson's first trial, Ashley was deemed incompetent to testify, but after the outcome of the first trial was

reversed on appeal, Ashley, then ten years old, was permitted to testify at the second trial. A major issue raised in Johnson's appeal from that conviction was the assertion of physician/psychotherapist privilege by Ashley's attorney ad litem over numerous reports prepared by one of Ashley's therapists.[2] These reports were never turned over to the defense, but they were placed under seal for the record on appeal in Johnson's second appeal. A review of those reports shows their significance. *Johnson v. State*, 342 Ark. 186, 27 S.W.3d 405 (2000) (*Johnson II*) was a 4–3 split decision, and the three dissenting justices addressed and quoted from those reports as follows:

> Had defense counsel been privy to [the therapist's] records, he would have been able to delve into [the therapist]'s conclusions that Ashley's stories were profoundly inconsistent and that she had been under considerable pressure from her family and the prosecutor to convict Stacey Johnson. A sampling of [the therapist]'s notations after therapy sessions with Ashley before the second trial reveals the following:
>
> • The DA says she's the only one who can "keep him behind bars."
>
> •. So much of what Ashley says is parroting other family members. For example, she says, "I'm the only one who can put him behind bars."
>
> • Her grandmother told Ashley that she "has to keep him behind bars," because if he gets out he'll try to kill Ashley next.
>
> • Her grandmother emphasized how much responsibility was on her, and if Johnson's sentence is overturned, Ashley will feel total responsibility.
>
> • Ashley kept wanting to elaborate on what she saw. Atty emphasized to her that all she has to say is that she saw Jason [sic] murder her mom, period.

---

[2]Arkansas Rule of Evidence 510 provides: "A person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter."

*Johnson II*, 342 Ark. at 205, 27 S.W.3d at 417 (Brown, J., dissenting). None of this was available for Johnson's defense at trial. There is at least one other relevant excerpt from the therapist's reports that was not identified in the *Johnson II* dissent. During a therapy session, after Ashley provided what the therapist describes as another "new" version of events from the night of the murder, Ashley "at 1 pt. . . . seemed to lose her memory of what she'd heard, and stated '*Let me go ask my aunt*[.]'" (Emphasis added.)

Without disparaging an innocent young girl whose life was surely turned upside down by this tragedy, the significance of the circumstances described above is apparent. The pressures exerted by Ashley's family members and the authorities are exactly the sort of circumstances Dr. Kovera identified as likely to influence human memory. The events in question occurred when Ashley was six years old, and as the dissent in *Johnson II* noted from the therapist's observations, "Ashley's stories were profoundly inconsistent." 342 Ark. at 204, 27 S.W.3d at 417. Whatever the collective impact of these influences was, it should be noted that at one point, Ashley implicated Branson Ramsey in her mother's death. During an interview with a different therapist, in response to the question, "Who do you think did it," Ashley stated, "I think they both did it, Branson Ramsey and Stacey Johnson." (R. 1477, 1998 Direct Appeal.) In short, Ashley's testimony at trial tending to identify Johnson as Carol Heath's murderer is not so reliable as to bar Johnson's petition for scientific testing.

### D. The "Cigarette Butt"

The origin of the "cigarette butt" with Johnson's saliva on it, reportedly discovered in the pocket of the green shirt found at the second crime scene, is perhaps the most concerning aspect of this case. At one point in his brief, Johnson's attorneys "question the

provenance" of this evidence. The State responds by stating that Johnson has accused investigators of "plant[ing]" this evidence at the crime scene, and that the accusation is baseless. However, a close review of the record from these cases reveals that Johnson has legitimate reason to be concerned. The chain of custody for the cigarette butt with Johnson's saliva is materially deficient. This deficiency undercuts the reliability of this evidence, and (despite the "plant" label volunteered by the State) supports the possibility that it was "swapped in" at some point after the evidence from the crime scenes was collected. But regardless of how the cigarette butt became evidence in Johnson's case, the presently observable shortcomings in its chain of custody render it an unreliable piece of evidence for purposes of our section 16-112-202(8) analysis.

To appreciate this concern, it is necessary to line out the details from several documents spread across the records of Johnson's past cases. This is a search–intensive inquiry, but as they say, the devil is in the details.

- Dated **April 7, 1993**, there is an Arkansas State Police report titled "Crime Scene Search." (R. 112, 1998 Direct Appeal.) This report is authored by investigators identifying several items recovered from the second crime scene and then sent to the state crime lab. It identifies the items placed into evidence bag "GGG-21" as "**Cigarettes and matches** taken from pocket of green shirt." "**GGG**" corresponds to the initials of the State investigator who gathered the evidence, whose last name is **Godwin**. The report provides that "[t]hese items were **photographed** . . . and copies of those photographs supplemented in this case file."

- Also dated **April 7, 1993**, is a document titled "Evidence Submission Form." (R. 94, 1998 Direct Appeal.) This form is utilized by investigators to identify specific items of evidence and to specify which forms of testing the investigators would like the state crime lab to perform on those items of evidence. The form contains a list of potential methods of testing to be selected, including "latent prints," "serology," "toxicology," etc. In the handwritten list of items submitted, there is a notation for ". . . **GGG-21**

32

**Cigarettes & matches** taken from pocket of green shirt." At the bottom of the form, next to "Type of Analysis Requested," is a handwritten notation for each item of evidence on the submission list, including "**GGG 21** Process for **Latents** and compare to GGG-18 . . . ." The filled-in submission form requested testing only for **latent fingerprints** on **GGG-21** and did request other forms of testing on the other items on the submission list.

- Dated **May 4, 1993**, is a state crime lab document titled "Report of Laboratory Analysis." (R. 123-124, 1998 Direct Appeal.) This report corresponds to "**Agency Case Number: 89-413-93,**" which **State Investigator Godwin**, whose name is listed on the state crime lab reports as the "**Investigating Officer**" and the addressee, identified as "my (Godwin's) case number." (R. 1086, 1998 Direct Appeal.) This report identifies several items of evidence that were **received by the lab on April 5, 1993,** for various testing. Among those items were "**Q4 – Breast Swabs**," which were subjected to "**Saliva Examination**." Also among those items was an item designated "**Q18 – T-shirt (GGG-22)**."

- Dated **May 10, 1993**, is another state crime lab document titled "Report of Laboratory Analysis." (R. 118, 1998 Direct Appeal.) This report identifies several items of evidence that were received by the state crime lab on April 5, 1993 to be tested for fingerprints. Among those items was "**GGG–21: Cigarettes and matches from pocket of green shirt.**" The report provides that the lab recovered prints from a Lifestyles condom package, one douche bottle, and latent lifts. All the prints were negative for Johnson.

- Dated **April 15, 1994**, is a Cellmark Diagnostics (Cellmark) document titled "Report of Laboratory Examination." (R. 32–33, 1998 Direct Appeal.) Cellmark was contracted to handle DNA testing for the state crime lab (at least what DNA testing was available at the time), and it issued several reports with the results of testing performed on various items of evidence in this case. Cellmark had issued at least three reports in this matter (dated January 19, February 18, and April 15, 1994 (R. 28–35, 1998 Direct Appeal)) before or at the same time of this report. I note that while these Cellmark reports, like the reports from the state crime lab, correspond to "**AR State Police Case No. 89-413-93**," State Investigator Godwin is not the addressee to whom the reports are directed; instead, the Cellmark reports are directed to "Investigator **Jim Behling** [new line] **DeQueen Police Department** [new line] . . . ." Each of the prior Cellmark reports, as well as this April 15, 1994 report, have certain things in common. All the Cellmark reports note the date upon which each item submitted for testing was received by Cellmark. All four of the Cellmark reports discussed thus far note that the evidence submitted for testing was received **either** in one batch on **December 2,**

**1993**, or in a second batch on **December 17, 1993**, in reference to "**Cellmark Case No. F931380**." Each of these four reports addressed items received in both batches. Additionally, all of the Cellmark reports discussed thus far identify each item of evidence with an "ID#" and "Description," which generally tracks with the designations previously utilized by the state crime lab. For example, this April 15, 1994 report notes that Cellmark performed testing on "Q18 – Material labelled '. . . white t-shirt . . .'" ("Q18 – T-shirt (GGG–22)" was listed on the previously described May 4, 1993 serology report from the state crime lab). This report also provided the results of testing performed on "Q4 – Two swabs labelled '. . . breast swabs . . .'" Importantly, the results from this report *excluded* Johnson as a contributor to whatever material was recovered on the swabs from the bite marks on the victim's breasts. Outside of Johnson's hairs, all the testing in the case thus far had excluded Johnson as a contributor to any of the genetic samples submitted for testing. Another forensic specialist has since opined that some of the results of this report were too faint to determine and could not actually exclude Johnson as a potential contributor to the breast swabs, but *at the time*, this report's exclusion of Johnson would have been a significant development in Johnson's case—a key exculpatory piece of evidence.

- Dated **June 1, 1994**, is another report from Cellmark. (R. 427–29, 2018 Act 1780 Appeal.) This report is different from the prior Cellmark reports in certain respects. First, the items submitted for testing are identified and described in less detail than those addressed in the prior reports. The two items submitted are identified and described as "**22 – one white t–shirt**" and "**21 – one cigarette butt labelled '. . . pocket of green shirt . . .'**" (ellipses in original). The numbers "22" and "21" seem *intended* to correspond to the previously utilized "GGG" numbers. Additionally, the report reflects that these items were received by Cellmark on different dates than all the other previously submitted evidence. The report says the white T–shirt was received **December 8, 1993**, and that the cigarette butt was received **May 16, 1994**. The results in the report **matched the DNA on the cigarette butt to Johnson**.

There is a great deal of information contained in each of these reports, but when you line up the relevant particulars, the timeline is beyond suggestive. The collective weight of this information indicates that the cigarette butt with Johnson's saliva actually came from somewhere other than **GGG–21** (supposedly the pocket contents from the green shirt at the second crime scene) and its corresponding chain of custody. From the very beginning

34

of this investigation until the June 1, 1994 report from Cellmark, every ounce of documentation indicated that it was "cigarettes [plural] and matches" that had been removed from the "pocket" of the green shirt found at the second crime scene and placed into evidence bag "**GGG–21**." At Johnson's first trial, when State Investigator Godwin was presented with his rough notes indicating that it was "cigarettes and matches taken from the pocket of the green shirt," he stated as follows:

> Q: Okay. So you would think that there were **cigarettes** that were found in that pocket?
>
> A: **More than one**, yes, ma'am.

(R. 2313, 1995 Direct Appeal.)

However, when other State witnesses (e.g., **Jim Behling** of the **DeQueen Police Department**) testified about **GGG–21**, they maintained that it was always a single cigarette butt (or as described in some places in the transcript, "a single partially smoked cigarette") taken from the green shirt at the second crime scene, and the saliva on that cigarette butt was matched to Johnson through testimony from other witnesses. To be clear, the Cellmark reports themselves were never entered into evidence for the jury's consideration—only testimony by State witnesses about the results contained in those reports.

That GGG–21 should have contained "cigarettes," as opposed to a single smoked "cigarette butt" or a single "partially smoked cigarette," is further supported by the fact that the investigators submitted GGG–21 to the state crime lab *only for fingerprint testing*. If GGG–21's contents, whatever they actually were, had already been smoked, and there was a possibility of obtaining a genetic profile from saliva thereon, then it is conspicuous that

35

investigators did not also request that GGG-21 receive testing for saliva.[3] This is especially true considering that other evidence collected at approximately the same time, such as the breast swabs, was submitted for saliva testing.

It is particularly concerning that Cellmark received what the June 1, 1994 report describes as "21 – **one cigarette butt** labelled '. . . pocket of green shirt . . .'" (ellipses in original) *nearly a half year* after Cellmark received all the other evidence submitted for testing. This was the first time the description changed from "**cigarettes**" to a single "**cigarette butt**." Additionally, each of those earlier reports had identified the items tested by maintaining the same "**GGG**," "**ME**," "**Q**," etc., formats utilized by the investigators, the medical examiner's office, and the state crime lab, so to maintain the corresponding chain-of-custody; those identifiers are missing from Cellmark's June 1, 1994 report.

While the date that the cigarette butt arrived at Cellmark came nearly a half year after all the other items of evidence were received, I note that the cigarette butt arrived at Cellmark *just one month after* Cellmark generated the April 15, 1994 report, which excluded Johnson as a contributor to the saliva on the breast swabs, as set forth above. This April 15, 1994 report marks what would have been a significant point in the case. Prior testing on the "green" shirt found at the second crime scene showed only that the blood on the green shirt belonged to Heath. The state crime lab had found fingerprints on the condom package and the douche bottle in Heath's apartment but determined that those fingerprints did not

---

[3]How the State was able to perform any meaningful testing on the partially smoked cigarette is a fair question, considering that it was allegedly found in water-soaked clothing that had been sitting in the rain for the previous two days.

belong to Johnson. Cellmark had identified a DNA profile contained on the white T-shirt found at the second crime scene but determined that it did not match Johnson.

At that point, the only remaining physical evidence tending to connect Johnson to either crime scene would be his hairs found in Heath's apartment, which the forensic experts would explain are "transient" in nature and easily transferred from item to item, which can make it difficult to draw reliable inferences about where any given hair is found. Moreover, Johnson had a plausible explanation for the presence of his hairs around Heath and her property (their physical/social encounters), and at any rate, there were Caucasian hairs that did not belong to the victim found at *both* crime scenes. The burden of proof in a criminal case is guilt beyond a reasonable doubt, and the prosecution would have had a difficult time meeting that burden without the late advent of this "cigarette butt" containing Johnson's saliva to connect him to the second crime scene.

When one considers additional information from Johnson's second prosecution, the illegitimacy of the cigarette butt becomes even more apparent. After the outcome of Johnson's first trial was reversed on appeal, a different attorney was appointed to represent Johnson in the second trial. Johnson's new attorney filed a motion for discovery. The State's response to Johnson's discovery request consisted of approximately two hundred pages and was filed in the record. (R. 21–219, 1998 Direct Appeal.) Interestingly, each of the Cellmark reports from the first prosecution was included in the State's response, except for one. The June 1, 1994 report, which contained the testing results on the cigarette butt, was omitted.

Johnson's attorney later filed another request titled "Motion for Discovery of DNA Testing and Materials." The prosecutor then sent Johnson's attorney a new report from

37

Cellmark dated **May 21, 1997**, which would again match the cigarette butt to Stacey Johnson. (R. 340–44, 1998 Direct Appeal.) This report provided that on **April 4, 1997**, Cellmark had **received** ten tubes of liquid submitted for Polymerase Chain Reaction (PCR) testing. Each tube of liquid contained extracted organic material. The material in one of the tubes was developed from a blood sample provided by Johnson, identified as follows:

> Liquid in tube labelled "**F931380 09**" (containing extracted
> DNA from the tube of blood labelled Stacy Johnson previously submitted on **December 2, 1993**)

(Parenthetical and indentation in original; emphasis mine.) The remaining nine tubes consisted of material extracted from items allegedly collected at the crime scenes. This report included the aforementioned identifiers corresponding to each item of evidence; for example:

> Liquid in tube labelled "**F931380 − 01 . . .**" (containing extracted
> DNA from the **root of the hair** labelled **GGG13** previously submitted on **December 17, 1993**)

> Liquid in tube labelled "**F931380 − 01s . . .**" (containing an
> extract from the **shaft of the hair** labelled **GGG13** previously submitted on **December 17, 1993**)

> Liquid in tube labelled "**F931380 − 03 . . .**" (containing extracted
> DNA from the **shaft of the hair** labelled **ME6** previously submitted on **December 17, 1993**)

(Ellipses, parentheticals, and indentations in original; emphases mine.) However, the report's description of the cigarette butt is as follows:

> Liquid in tube labelled "**F931380 12**" (containing extracted
> DNA from a **cigarette butt** previously submitted on **May 16, 1994**)

(Parenthetical and indentations in original; emphasis mine.) A close review of this **May 21, 1997** Cellmark report further substantiates that the cigarette butt with Johnson's saliva came from somewhere other than evidence bag "**GGG–21**."

First, while the **June 1, 1994 Cellmark report** was notable because its notation for the "**cigarette butt**" (recall that the June 1, 1994 report was the first time the description changed from "cigarettes" to a single "cigarette butt") lacked the "**GGG**" identifier, this **May 21, 1997 report** does not even have the "**21**" identifier; it just states that PCR testing was performed on a cigarette butt received by Cellmark on **May 16, 1994**. Additionally, note the presence (or lack thereof) of ellipses (. . .) inside the end quotation marks preceding the descriptive parentheticals for each item. Of the ten items addressed in this report, eight contain the ellipses inside the end quotation mark, and each of those eight follows up with a parenthetical that describes the item with the same identifiers previously utilized by the investigators and the crime lab, e.g., "GGG," "ME," etc.

Of the two items that lack the ellipses, one of them, "**F931380 09**," is the blood sample provided by Johnson. With regard to this item, perhaps the lack of ellipses makes sense—the chain of custody *should be* different here. The sample of Johnson's blood could not have been obtained until after his arrest, well after the other items had been collected from the two crime scenes and submitted for testing—hence also the absence of a "GGG" or other such identifier in the parenthetical following this item. But that explanation obviously cannot be applied to "**F931380 12**," the tube containing DNA from the cigarette butt (which, like the other eight original items addressed in this report, was allegedly

collected by investigators at the crime scenes), yet there are no ellipses contained in the description for this item, nor are there identifiers in the following parenthetical.

These discrepancies become even more significant when one considers the difference in State Investigator Godwin's testimony between the first and second trials. On direct examination by the prosecutor at the second trial, when presented with the April 7, 1993 "Evidence Submission Form," Investigator Godwin testified as follows:

> Q: Okay. Are you saying that there were **multiple cigarettes** found in that pocket **or was that an error on your part**?
>
> A: It was an **error on my part**.
>
> Q: Is there **any doubt in your mind**, Investigator Godwin, that one partially smoke[d] cigarette along with this book of matches was found in this green shirt pocket?
>
> A: **That's all that was found**.

(R. 1088, 1998 Direct Appeal.) The disparity in Investigator Godwin's testimony between the two trials is ominous. In light of the circumstances described above, his credibility on this point is irretrievably compromised.

Overall, the originally utilized—then later abandoned—identifiers, the altered descriptions, the investigation timeline and the gaps therein, the changed testimony—when considered together, show that the cigarette butt is an unreliable piece of evidence. The reasonable conclusion is that this evidence came from somewhere other than where the rest of GGG-21's contents allegedly came from. *See Crisco v. State*, 328 Ark. 388, 943 S.W.2d 582 (1997). The cigarette butt's chain of custody is materially deficient, and the right inquiry may show it to have been determinably manufactured. Put simply, this evidence is so lacking

in requisite authentication that it *should not have been allowed at either trial*, and the fact that it was allowed poisoned the outcome of both.

Again, of all the documents discussed in this section, the only one that was ever entered as an exhibit for the jury's consideration at either trial was the April 7, 1993 "Evidence Submission Form." Without having all these documents lined out together and a breakdown such as that set forth in this opinion (Johnson's trial attorneys certainly made no attempt to make such a presentation, if they even realized the chain-of-custody breakdown), it would be entirely unrealistic to expect a jury of laypersons to grasp each of these details and appreciate what they ultimately together reveal, especially considering the horrific facts being laid out in each trial. For purposes of our section 16-112-202(8) analysis, it is plain enough that this evidence did not come from "GGG-21" and its corresponding chain of custody. This court can discount the probative value of the cigarette butt without determining exactly where it came from or how it got there.

However, note one last set of observations regarding these "cigarettes," which later turned into a single "cigarette butt," and then a single "partially smoked cigarette" by the time Investigator Godwin testified at Johnson's second trial. The April 7, 1993 "Crime Scene Search Report" discussed above provided that each item of evidence discussed in the report, including "**GGG-21** . . . **Cigarettes and matches** taken from pocket of green shirt" was "**photographed** . . . and copies of those photographs supplemented in this case file." However, the record contains no photographs associated with any cigarette(s) (whether single or multiple, smoked or unsmoked) relating to the green shirt from the second crime scene. No such photograph was introduced at either trial. Furthermore, there

is a discussion in the transcript from Johnson's Rule 37 hearing in which the attorneys are purportedly searching for the photographs, maintaining that they are supposed to be in the case file, but they are unable to locate them.

But, elsewhere in the record, there *is* a photograph featuring at its center a single, partially smoked cigarette, *not from the second crime scene* out in the woods but *lying on the floor of Heath's apartment*. Inexplicably, there is no indication that the partially smoked cigarette from the floor of Heath's apartment was ever collected by investigators or submitted for any testing—some unidentified investigator photographed it, and then it simply disappeared. There is no indication of its existence anywhere else in the record. I also note from Sharon Johnson's deposition that the authorities were asking about the type of cigarettes Johnson smoked, and that when they first questioned Sharon (the same morning the body was found, which is also when the authorities obtained from Sharon the description of Johnson's clothing), the investigation of the first crime scene would not have been complete. Any more might involve some degree of speculation, but there is an obvious question this photograph brings to mind: Is *this* (the floor of Heath's apartment) where the cigarette containing Johnson's saliva *actually* came from? If further inquiry could confirm that possibility to be the truth, the impact would be substantial—both[4] eliminating evidence that

---

[4]Disclosing the *existence* of an item of evidence is not the same as disclosing the *location* where that item of evidence was (actually) found. From *Johnson I* to the present case, the State has always maintained that the cigarette butt with Johnson's saliva came from the green shirt at the second crime scene. A reasonable assessment of the circumstances outlined herein dispels that proposition. Maybe it came from the floor of Heath's apartment, maybe it came from the jail where Johnson awaited trial, maybe it came from somewhere else, but it did not come from where the State has always represented it did. *See Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

investigators used to linked Johnson to the second crime scene and bolstering the contention that Johnson's visit with Heath was social.[5]

Overall, the "cigarette butt" evidence is not so overwhelming as to bar Johnson's request for scientific testing.

### E. Analysis

Finally, application of law. To satisfy section 16-112-202(8), Johnson has to show how his proposed testing "may" produce new evidence that would "support" his theory of innocence and show a "reasonable probability" that he did not kill Carol Heath. Ark. Code Ann. § 16-112-202(8). Johnson has satisfied these requirements.

The modern landscape of forensic science and technology is entirely different from what it was in the 1990s. Within the last two decades, DNA testing has significantly advanced in (1) sensitivity and discriminatory ability, (2) forms of testing, and (3) methods of collection and analysis; Johnson presented substantial evidence and academic literature about these advancements at the hearing below on his postconviction petition for scientific testing and to this court on appeal. DNA expert Meghan Clement testified: "[I]t is possible to distinguish mixtures more easily today . . . we could subtract [Ms. Heath's profile] from the overall mixture . . . (of DNA profiles on specific item(s) of evidence) . . . in order to develop a profile which may or may not be CODIS-eligible." Forensic analyst Huma Nasir similarly noted:

> Modern DNA technology . . . is considerably more sensitive and sophisticated than the testing available in 1994 and 1997 . . . and in 2002 . . . Current DNA technology is sensitive enough to identify an individual's unique DNA profile from a microscopic amount of biological material

---

[5]There was no indication of forced entry at Carol Heath's apartment.

previously undetected . . . [and] is also designed to develop DNA profiles from poorly preserved or decades-old degraded samples that were [previously] unsuitable for testing.

These advancements have also significantly changed *where* DNA can be found, creating the possibility of finding DNA on evidence that was not able to be tested decades ago. Nasir stated further:

In 2002 and before, it was common . . . to test only those samples with viable stains or those otherwise known to contain biological material . . . [b]y contrast, forensic scientists now collect and test samples from items where no biological material is visible . . . [W]e now sample items that were only touched or handled by the perpetrator of a crime to test 'touch DNA.'

For example, Y-STR testing, which only became available at the Arkansas State Crime Lab ("ASCL") in 2007, tests for DNA on the Y chromosome. This testing makes it possible to separate multiple male profiles in a single biological sample and find male DNA in a sample that would otherwise have been overwhelmed by a female donor. There is also now miniSTR testing, which became available at ASCL in 2009 and which applies STR technology to commonly observed DNA samples involving distinctly degraded biological evidence. This testing aims to enhance genetic samples, so to reveal a profile that may have previously been deemed inconclusive. Additionally, mitochondrial DNA testing became available at ASCL in 2001. Mitochondrial DNA testing analyzes DNA found in the cytoplasm of the cell; that is, the area that surrounds the nucleus. The mitochondrial genome, which is unchanged as it is passes from mother to child, is passed on to all the offspring of a mother and to those children's offspring. Mitochondrial DNA testing thus provides one particular advantage over STR testing: it can be compared to forensic samples

44

that do not have the nucleated chromosomal information required for STR and thus may be used on biology without nucleated cells, including hair with no "root."

These modern forms of scientific testing could have extensive application to the evidence of Johnson's case, and in light of the apparent shenanigans in the handling of these items in the past, I would order new testing on literally every single piece of evidence. For purposes of the analysis here, simply note some of the more obvious testing opportunities.

Regarding the "inch-and-a-half red beard hair," as well as the other Caucasian hairs dissimilar to the victim's, any and all testing that could potentially develop a genetic profile from these items for comparison to the other evidence is *obviously* necessary. Consider, for example, the potential result of a DNA profile obtained from the red beard hair (collected at the first crime scene from the hand of the victim's body, which was covered in defensive wounds) being matched to the existing but presently unknown DNA profile on the white T-shirt collected at second crime scene. Johnson obviously did not shed the red beard hair— instead, this match would strongly suggest that it was a white man with a red beard who killed Heath and then dumped her purse and the other items out in the woods. At the least, the known biological evidence at that point would provide a far better case against the person with the red beard than the case against Johnson; the only biological evidence linking Johnson to the second crime scene is the cigarette butt addressed in Part III(D) of this opinion. In this way, a match between a profile obtained from any of the dissimilar Caucasian hairs and a profile from any of the evidence closely associated with the crime would significantly advance Johnson's claim of innocence.

But the potential result described in the paragraph above is just one possibility, tailored to the biological evidence already known to exist. If more sensitive modern testing revealed another male's DNA on the rape kit and smears, the douche–fluid swabs, Heath's underwear, the tissue paper found beneath her body, her pubic hairs, or the breast swabs (which have already shown the presence of saliva), that would be significant as well. There is an untold number of possible result combinations that would substantiate Johnson's claim of innocence. Certainly, Johnson's proposed testing "may" produce evidence that would "support" his theory of innocence and show a "reasonable probability" that he did not kill Carol Heath.

The majority's conclusion also disregards our maxims of statutory interpretation. Act 1780 was remedial legislation that must be liberally construed to accomplish its purpose. *See, e.g.*, *City of Fort Smith v. Wade*, 2019 Ark. 222, 578 S.W.3d 276 (remedial legislation such as the Freedom of Information Act must be liberally construed to accomplish its purpose). When construing any statute, we place it beside other statutes relevant to the subject matter in question and ascribe meaning and effect to be derived from the whole. *Standridge v. State*, 2014 Ark. 515, at 9, 452 S.W.3d 103, 109. Here, the introductory provision that precedes Arkansas Code Annotated section 16–112–202, section 16–112–201, is instructive:

> (a) Except when direct appeal is available, a person convicted of a crime may commence a proceeding to secure relief by filing a petition in the court in which the conviction was entered to vacate and set aside the judgment and to discharge the petitioner *or* to resentence the petitioner **or** grant a new trial **or** correct the sentence *or* make other disposition *as may be appropriate*, if the person . . . [satisfies the requirements of the statute].

Ark. Code Ann. § 16–112–201(a) (emphasis added). Section 16–112–208, which prescribes the procedures for conducting the new testing after it is ordered, further illustrates that this

process was intended to be an organic, truth-seeking inquiry that can adapt to the particular evidentiary circumstances of a given case:

> (b) **If** the deoxyribonucleic acid (DNA) test results obtained under this subchapter are **inconclusive**, the court **may** order **additional testing** or **deny further relief** to the person who requested the testing.

Ark. Code Ann. § 16-112-208(b) (emphasis added).

In short, this process cannot function if the petitioner is required to exonerate himself on the front end before he is permitted to receive the testing. *See, e.g.*, *Garner v. State*, 2012 Ark. 271, at 2 (per curiam) ("Evidence does not have to completely exonerate the defendant in order to be 'materially relevant,' but it must tend to significantly advance his claim of innocence."). The process must be able to meaningfully address the varying and often complicated fact patterns that are the subject of criminal prosecutions, and the members of our legislature knew that when they drafted the statutes prescribing this process. Had the legislature intended testing to be available only to people who could affirmatively and conclusively establish that they were wrongfully convicted beyond all doubt, the statute would not have afforded the judge in whose court one of these postconviction-testing cases is filed with the *discretion* "to vacate and set aside the judgment and to discharge the petitioner *or* to resentence the petitioner *or* grant a new trial *or* correct the sentence *or* make other disposition *as may be appropriate*[.]" Ark. Code Ann. § 16-112-201(a) (emphasis added).

The overall theme of the majority opinion seems to be that because there is already evidence connecting Johnson to both crime scenes ("Johnson's saliva on the partially smoked cigarette in the pocket of the bloody green shirt at the roadside park (see Part III(D) of this opinion) and his hairs discovered on and around Heath's body" (Maj. Op. at 12)),

47

he is therefore incapable of "disproving" his guilt. That a majority of this court would endorse this proposition, especially when there are Caucasian hairs (several more, actually) that have never been tested found in the same places (several more, actually) that Johnson's were found, is nothing short of incredulous. In almost the same breath, the majority suggests that there would be an innocent explanation if Brandon Ramsey's DNA was matched to the untested Caucasian hairs or any of the other items of evidence from either crime scene, since he (like Johnson) purportedly had a prior sexual relationship with the victim. There is no equal application of rationale.

If Johnson's case does not deserve the benefits of modern science, it is difficult to conceive of a case that would. That Johnson could be absolutely innocent of Carol Heath's murder is a very real possibility, and his proposed testing would put that possibility to the test. Johnson acknowledges that, hypothetically, the results of this testing could incriminate him further, yet he still pleads that we order the testing. Johnson's attorneys are even willing to pay for it.[6] What interest—the public's faith in the judiciary or otherwise—is served by

---

[6]The very notion that *the State has the authority* to <u>forever</u> shield this evidence from Johnson's inspection is not supported by any persuasive rationale. To the extent the Supreme Court suggested otherwise in *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009), I respectfully disagree. Johnson's attorneys provided at oral argument that they would be willing to pay for all the proposed testing from their own funds. Why shouldn't an incarcerated person (through his legal representative) be allowed to access and inspect evidence from *his own case*, especially when it would involve no cost to the State? "All political power is inherent in the people and government is instituted for their protection, security and benefit[.]" Ark. Const. art. 2, § 1. "All men are created equally free and independent, and have certain inherent and inalienable rights; amongst which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property, and reputation; and of pursuing their own happiness. To secure these rights governments are instituted among men, deriving their just powers from the consent of the governed." Ark. Const. art. 2, § 2. Furthermore, even if there is no constitutional right to post-

denying this request? Even if it is *true* that Johnson killed Carol Heath, and the results of Johnson's proposed testing only *confirmed* as much, *surely* that outcome would be preferable to executing Johnson under the present circumstances. Perhaps those opposing Johnson's proposed testing are simply anxious about what it could *possibly* reveal—that another conviction[7] of a black man in the 1990s was attributable to investigative failures[8] and bias, and not to actual guilt.

Modern science can be a valuable check on the functionality and reliability of our entire criminal justice system, including the past work of this court. Johnson's proposed

conviction scientific testing as a general matter, surely there should be an exception to that proposition where, as here, the circumstances of the case indicate that evidence was actually mishandled (or affirmatively ignored) in a material way.

[7]*See, e.g.*, Samuel R. Gross et al., *National Registry of Exonerations, Race and Wrongful Convictions in the United States* ii (2017) ("African Americans are only 13% of the American population but a majority of innocent defendants wrongfully convicted of crimes and later exonerated. They constitute 47% of the 1,900 exonerations listed in the National Registry of Exonerations (as of October 2016), and the great majority of more than 1,800 additional innocent defendants who were framed and convicted of crimes in 15 large-scale police scandals and later cleared in 'group exonerations.'").

[8]The analysis contained in this dissent is limited to the circumstances presently before the court. Not every investigation has the problems this one did. But without a complete characterization of the evidence, the reader's perspective is not sufficiently informed to appreciate the difference Johnson's proposed testing could make. Literally, this investigation revealed far more biological evidence suggesting a white perpetrator than a black one, yet investigators only sought to develop a black man as a suspect and did not pursue the evidence suggesting a white perpetrator in any respect. If merely pointing out such obviously problematic circumstances makes one insecure about his or her perceived racial neutrality, then instead of crying foul, perhaps one should simply reassess the situation. "[T]he public's trust in the integrity of our criminal justice system" (Maj. Op. at 13) is earned by *transparency*—not by burying the circumstances that would cast doubt upon our conclusions and then stubbornly refusing to acknowledge their existence. The particular vulnerabilities of the evidence in this case are highly relevant to Johnson's petition for scientific testing; there can be no informed legal assessment of Johnson's petition without these circumstances being addressed and their impact considered.

testing could provide the answers this case is missing, but the majority will not allow it. I do not see the sense in this decision. We should welcome such an opportunity for the truth, whether to flush it out for the first time or to eliminate the doubts presently surrounding this conviction. The fact that we are instead rejecting that opportunity leaves me troubled. What are we so afraid of?

I dissent.

**ROBIN F. WYNNE, Justice, dissenting**. I believe appellant has satisfied his burden to obtain DNA testing under Act 1780 of 2001. For that reason, I dissent.

The majority concludes that the testing requested by Johnson would not significantly advance his claim of innocence even if it revealed the presence of DNA belonging to another individual. The majority is mistaken. As the majority recites, hairs belonging to Johnson were found at the crime scene. Hairs belonging to another individual who could not be Johnson[1] were also found at the scene. At trial, the jury was aware that hairs belonging to another individual who was not Johnson were present at the scene.

This does not mean that the testing sought by Johnson cannot significantly advance his claim of innocence. The State sought to have the jury draw the conclusion at trial that the Caucasian hairs were from an individual who did not commit the rape and murder. However, there was evidence that Johnson had been in the victim's home previously, leaving the presence of his hairs at the crime scene subject to the same explanation as the presence of the other hairs. Not as subject to an innocent explanation is DNA obtained

---

[1]Johnson is African American. The other hairs found at the crime scene were Caucasian in origin.

from a bite mark on the victim's breast. Testing at the time of trial revealed the presence of the victim's DNA, along with the DNA of a second contributor. The identity of the second contributor could not be determined from testing available at the time of trial. There was testimony at the hearing on Johnson's petition that advances in testing make identifying the second contributor through retesting more likely. Were DNA to be discovered from the breast swab that belonged to neither Johnson nor the victim, I am hard pressed to see how that would not significantly advance his claim of innocence.

In addition, vaginal swabs taken from the victim were not tested because no semen was detected. There was testimony during the hearing on Johnson's petition that advances in testing would allow for the detection of DNA in the absence of semen. Again, I fail to see how, if DNA were to be detected from this evidence that did not belong to Johnson or the victim, this would not significantly advance his claim of innocence. Due to the testimony at the hearing on Johnson's petition, I believe that he has satisfied the requirements under Act 1780 for DNA testing. Accordingly, I would reverse the circuit court's decision and remand for testing to be conducted.

For these reasons, I dissent.

*Bryce Benjet*, pro hac vice, The Innocence Project; and *Lassiter & Cassinelli*, by: *Erin Cassinelli*, for appellant.

*Leslie Rutledge*, *Att'y* Gen., by: *Pamela Rumpz*, Ass't Att'y Gen., for appellee.